REVISED - March 16, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30228
_____


IFEANYI CHARLES ANTHONY OKPALOBI,
doing business as Gentilly Medical
Clinic for Women,

                                        Plaintiff-Appellee,

and

CAUSEWAY MEDICAL SUITE; BOSSIER CITY
MEDICAL SUITE; HOPE MEDICAL GROUP FOR
WOMEN; DELTA WOMEN'S CLINIC; WOMEN'S
HEALTH CLINIC; JAMES DEGUERCE;
A. JAMES WHITMORE, III,

                                        Intervenors-Appellees,

                        versus

MIKE FOSTER, Governor of the State of
Louisiana; STATE OF LOUISIANA,
Substituted in place of Kenneth Duncan,
Treasurer of the State of Louisiana,

                                        Defendants-Appellants.
_____

            Appeal from the United States District Court for the
                        Eastern District of Louisiana
                           USDC No. 97-CV-2214-T
_____
                             March 12, 2001
Before KING, Chief Judge, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH,
WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART,
PARKER, and DENNIS, Circuit Judges.[*]

_____

    [*]Fourteen judges participated in this en banc proceeding.
Seven judges join Judge Jolly's opinion in full, both with regard
to standing and the Eleventh Amendment analysis (Jolly, Davis,

E. GRADY JOLLY, Circuit Judge:

Sitting as an *en banc* court, we consider whether the district court properly enjoined the "operation and effect" of the Louisiana state tort statute at issue, which provides a private cause of action against medical doctors performing abortions. Although, in this facial attack on the constitutionality of the statute, consideration of the merits may have strong appeal to some, we are powerless to act except to say that we cannot act: these plaintiffs have no case or controversy with these defendants, the Governor and Attorney General of Louisiana, and consequently we lack Article III jurisdiction to decide this case. Seven members of this en banc court conclude that the panel was in serious error, as indeed is the dissent, in finding that this case presents an Ex parte Young exception to the Eleventh Amendment immunity from suit in federal court, which these defendants, the Governor and Attorney General of Louisiana, enjoy. Accordingly, we reverse, vacate, and remand for entry of a judgment of dismissal.

I

---

Jones, Smith, Barksdale, Emilio Garza, and DeMoss). Three judges join Judge Jolly's opinion with regard to standing only (King, Higginbotham, and, in part, Benavides). Four judges join Judge Parker's dissent (Parker, Wiener, Stewart, and Dennis). Judge King joins Judge Higginbotham's opinion. However, to fully understand the scope of the partial concurrences to Judge Jolly's opinion, the reader is referred to the opinions of Judges Higginbotham and Benavides.

Dr. Ifeanyi Charles Anthony Okpalobi ("Okpalobi"), joined through intervention by five health care clinics and other physicians, individuals, and businesses who perform abortions in the State of Louisiana,[1] challenge the constitutionality of La. R.S. Ann., tit. 9, § 2800.12 (West Supp. 1999), or, more commonly, "Act 825."[2]  The defendants are Mike Foster, Governor of Louisiana,

---

[1]Because we find no significant distinction between the positions of Dr. Okpalobi and the intervening clinics and physicians on appeal, we use "plaintiffs" in this opinion to include all intervenors as well as Dr. Okpalobi.

[2]Act 825 states:

Section 2800.12 Liability for termination of a pregnancy

A.  Any person who performs an abortion is liable to the mother of the unborn child for any damage occasioned or precipitated by the abortion, which action survives for a period of three years from the date of the discovery of the damage with a preemptive period of ten years from the date of the abortion.
B.  For purposes of this Section:
(1) "Abortion" means the deliberate termination of an intrauterine human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself, with an intention other than to produce a live birth or to remove a dead unborn child.
(2) "Damage" includes all special and general damages which are recoverable in an intentional tort, negligence, survival, or wrongful death action for injuries suffered or damages occasioned by the unborn child or mother.
(3) "Unborn child" means the unborn offspring of human beings from the moment of conception through pregnancy and until termination of the pregnancy.
C.(1) The signing of a consent form by the mother prior to the abortion does not negate this cause of action, but rather reduces the recovery of damages to the extent that the content of the consent form informed the mother of

3

and Richard Ieyoub, Attorney General of Louisiana.[3]  No patients of the plaintiffs appear as parties in this suit.

Act 825 provides to women who undergo an abortion a private tort remedy against the doctors who perform the abortion.  It exposes those doctors to unlimited tort liability for any damage caused by the abortion procedure to both mother and "unborn child." Damages may be reduced, but not eliminated altogether (and perhaps not at all with respect to any damages asserted on behalf of the fetus), if the pregnant woman signs a consent form prior to the abortion procedure.

The plaintiffs argue that Act 825 constitutes an "undue burden" on a woman's right to obtain an abortion and is thus unconstitutional under <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 112 S.Ct. 2791 (1992).  The plaintiffs further claim that the Act

---

the risk of the type of injuries or loss for which she is seeking to recover.
(2) The laws governing medical malpractice or limitations of liability thereof provided in Title 40 of the Louisiana Revised Statutes of 1950 are not applicable to this Section.

[3]Although the record shows that the Attorney General of Louisiana was named as a party and was served with citation, and although he is named as a party in all of defendants' pleadings, in the injunction orders, and on the notice of appeal, he does not appear as a party on the docket sheet in this court.  He nevertheless has invoked the appellate jurisdiction of this court and is a party to this appeal.

will force physicians in Louisiana to cease providing abortion services to women because of the potential exposure to civil damage claims authorized by the Act.[4]  Finally, the plaintiffs assert that, if they are forced to discontinue providing their services, the State may have achieved in practical terms what it could not constitutionally do otherwise--eliminate abortions in Louisiana.

## II

The district court granted a temporary restraining order enjoining implementation of the Act on August 14, 1997.  Act 825, according to the district court, "has the purpose and effect of infringing and chilling the exercise of constitutionally protected rights."  The court therefore granted the plaintiffs' request for a preliminary injunction on January 7, 1998.  See Okpalobi v. Foster, 981 F.Supp. 977, 986 (E.D. La. 1998).  The following month, finding that the Act places an unconstitutional undue burden on a woman's right to abortion, the court converted the temporary injunction into a permanent injunction.[5]  The State timely appealed.

---

[4]Plaintiffs provide over eighty percent of the abortion services rendered in Louisiana.

[5]In the district court neither party, nor the district court, raised the question of an Article III case or controversy or the Eleventh Amendment.

5

On appeal, a panel of this court upheld the injunction. Okpalobi v. Foster, 190 F.3d 337 (5th Cir. 1999). The panel specifically addressed the Eleventh Amendment issue--whether, under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441 (1908), the state official defendants had sufficient "connection" to the act in question to overcome the Eleventh Amendment bar of suits against states in federal court.[6] The panel determined that "the Governor and the Attorney General have powers and duties under state law sufficient to meet the minimum requirements under the Eleventh Amendment." Okpalobi, 190 F.3d at 346. The panel further concluded that the plaintiffs had standing to assert their rights and the rights of their patients. Id. at 350-353. The panel then concluded that a case and controversy existed between these plaintiffs and defendants and affirmed the district court's holding that Act 825 is unconstitutional in its entirety.

In addressing the issues before this en banc court, we first take note that the panel opinion's jurisdictional holding rested primarily on the Ex parte Young exception to the Eleventh

---

[6]The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court has interpreted the amendment to also constitute a bar on a suit brought against a State by its own citizens in federal court. See Hans v. Louisiana, 134 U.S. 7, 10 S.Ct. 504 (1890).

6

Amendment. It is, of course, one of the purposes of taking a case en banc to clarify the law when a "panel decision conflicts with a decision of the United States Supreme Court" or the case "involves one or more questions of exceptional importance." Fed. R. App. P. 35(b)(1). Because the panel opinion erroneously applied established Eleventh Amendment jurisprudence, and because it was the focus of its jurisdictional holdings, we first address those panel errors before turning to the more basic question of whether this case presents an Article III case or controversy.

III

The crux of the Eleventh Amendment issue in this case is whether the named defendants, Louisiana's Governor and Attorney General, have the requisite "connection" to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State. We first say a very brief word about the historical and constitutional forces that underlie the Eleventh Amendment.

The Eleventh Amendment was adopted in 1798 in direct response to the Supreme Court's decision in Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793), holding that the State of Georgia could properly be called to defend itself in federal court against a citizen's suit. The alacrity with which Congress and the states approved the Eleventh Amendment to nullify Chisholm evinces the absolutely

7

certain and fundamental respect the early fathers demanded the federal courts pay to the sovereignty of the several states.[7] Although the attention given to the Eleventh Amendment has waxed and waned in the two hundred years since its adoption, the importance of it as a structural definition of our constitutional system has never been doubted.  Thus, the Supreme Court recently reemphasized that this structural principle remains intact in <u>Alden v. Maine</u>, 527 U.S. 706, 713, 119 S.Ct. 2246 (1999).  There, the Court stated that "as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratifications of the Constitution, and which they retain today."[8]  Indeed, it is "a settled doctrinal understanding, consistent with the leading advocates of the Constitution's ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."  <u>Id.</u> at 728.

---

[7]The Supreme Court decided <u>Chisholm</u> on February 14, 1794. Three weeks later, Congress had approved the Eleventh Amendment, and within one year the requisite number of states had ratified the amendment.

[8]"The States thus retain 'a residuary and inviolable sovereignty.'  They are not relegated to the role of mere provinces or political corporations, but retain the dignity . . . of sovereignty."  <u>Id.</u> at 715 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)).

8

It is against this background of the overriding importance of the Eleventh Amendment in limiting the power of the federal courts over the sovereignty of the several states, that we now consider whether the facts of this appeal can fit into the exception carved from the Eleventh Amendment in Ex parte Young, so as to allow the federal courts to enjoin Act 825.

IV

A

The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested.  See Hutto v. Finney, 437 U.S. 678, 700, 98 S.Ct. 2565 (1978).  A plaintiff may not avoid this bar simply by naming an individual state officer as a party in lieu of the State.  Yet, few rules are without exceptions, and the exception to this rule allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute.  This exception rests on the fiction of Ex parte Young--that because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment.

Indeed, the Eleventh Amendment inquiry today turns on a proper interpretation and application of the Supreme Court's holding in Young.

Young, in relevant part, reads:

> If, because they were law officers of the state, a case could be made for . . . testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general . . . . That would be a very convenient way for obtaining a speedy judicial determination of . . . constitutional law . . ., but it is a mode which cannot be applied to the states . . . consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons . . . In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, . . . such officer must have some connection with the enforcement of the act, or else it is merely making . . . the state a party.

209 U.S. at 157 (emphasis added).

The principle of Young grew out of two predecessor cases, and can best be understood by reference to Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418 (1898), and Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269 (1899). We begin with a discussion of these two decisions before addressing Young and its progeny.

B

In Smyth, the plaintiffs challenged the constitutionality of a Nebraska act regulating railroad rates for the transportation of freight and establishing penalties for violations of the act. The

10

statute authorized the assessment of substantial fines by state authorities in addition to private liability. See Smyth, 169 U.S. at 476. The plaintiffs named officers of the State as defendants. The defendants contested the federal court's jurisdiction on the grounds "that these suits are, in effect, suits against the state, of which the circuit court of the United States cannot take jurisdiction consistently with the eleventh amendment." 169 U.S. at 518. After holding that "a suit against individuals for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff is not a suit against the state within the meaning of [the eleventh] amendment," the court assumed jurisdiction of the case and struck down the law. Id. at 519.[9]

Although Smyth did not raise the question of how close a connection is required between the defendant state officers and the enforcement of the act, the Supreme Court elaborated on the principle when the question was presented the following year in

---

[9]The panel opinion suggests that Smyth stands for the proposition that no special connection is required between a defendant state official and the challenged statute. See Okpalobi, 190 F.3d at 344. However, the excerpt from Smyth quoted above clearly indicates that the defendant officers had a duty to enforce the statute in question and seems to undermine the panel's conclusion that Smyth did not involve a 'special relationship' between the defendants and the challenged statute. Id.

11

Fitts.[10]  There, the court was faced with a constitutional challenge to an Alabama act that prescribed certain maximum rates of toll to be charged on a Tennessee river bridge.  The act provided that, if the maximum rate was exceeded, the aggrieved party could recover twenty dollars per infraction from the offender.  172 U.S. at 516.  The plaintiffs, arguing that the rates of toll were "arbitrary" and "unreasonable" and constituted a deprivation of property, sued the governor and attorney general of Alabama as defendants and requested injunctive relief.  The defendants moved "that the bill be dismissed upon the ground that the suit was one against the state, and prohibited by the constitution of the United States." Id. at 518.

In concluding that the suit against the governor and attorney general was effectively a suit against the state and thus barred by the Eleventh Amendment, the Supreme Court reasoned that neither the governor nor the attorney general "appear[s] to have been charged by law with any special duty in connection with the act."  Id. at 529.  The court distinguished other cases in which it had exercised jurisdiction (including Smyth) by noting that "the defendants in each of those cases were officers of the state, specially charged

_____

[10]The sufficiency of the enforcement power vested in the defendant state officials was never addressed in Smyth.  It is clear, however, that the defendants in Smyth possessed enforcement powers not found in the defendants in the case before us.  See Smyth, 169 U.S. at 476.

12

with the execution of a state enactment alleged to be unconstitutional." Id. (emphasis added). Thus, in Fitts, the Supreme Court articulated the requirement that there be a "close" connection or a "special relation" between the statute and the defendant state officer's duty before the Eleventh Amendment bar could be overcome:

> There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement.

Id. at 529-30 (emphasis added). The court rationalized this relationship requirement by reference to the core constitutional principle embodied in the Eleventh Amendment:

> If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute . . . then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. This would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law . . . but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their

13

assent, be brought into any court at the suit of private persons.

Id. at 530.  Thus, Fitts illuminated the important precept that allowing state officers to be sued in lieu of the State absent some "special connection" would permit the narrow exception to swallow the fundamental, constitutionally-based rule.  It was upon this foundation that the Young doctrine was constructed.

C

In Young, the plaintiffs challenged a Minnesota statute that created a railroad commission, which executed an order fixing the rates various railroad companies could charge for the carriage of merchandise.  209 U.S. at 127.  The legislature delineated specific penalties for violations of such railroad regulations, including fines and possible imprisonment.[11]  The attorney general, Edward T. Young, was named as a defendant in the suit, which challenged the constitutionality of the series of state acts regulating the railroad companies.[12]  Specifically, the plaintiffs requested

---

[11]"It was provided in the act that 'any railroad company, or any officer, agent, or representative thereof, who shall violate any provision of this act, shall be guilty of a felony, and, upon conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment . . .'"  Id. at 128.

[12]"For this reason the complainants allege that the above-mentioned orders and acts . . . denied to the . . . railway company

14

"[a]ppropriate relief by injunction against the action of the defendant Young." Id. at 131. Young asserted that the federal court had no jurisdiction over him as attorney general because the suit was, in effect, against the state of Minnesota and barred by the Eleventh Amendment. Nevertheless, the federal court issued a temporary injunction against Young, enjoining him "from taking or instituting any action or proceeding to enforce the penalties and remedies specified in the act." Id. at 132. Young ignored the court order and immediately filed a mandamus action in state court to compel the railroad's compliance with the state law. Young was held in contempt by the federal court and taken into custody. He then petitioned for habeas corpus to the United States Supreme Court, asserting that the federal court injunction violated the Eleventh Amendment. The Supreme Court was thus required to determine whether Young, as a state officer, could be sued in federal court despite the Eleventh Amendment bar.

The court determined that the Eleventh Amendment did not bar a federal court injunction against the enforcement of the state statute. It held that Young, as attorney general, could properly

---

and its stockholders . . . the equal protection of the laws, and deprived it and them of their property without due process of law . . ." Id. at 131.

15

be enjoined in federal court from enforcing unconstitutional state penalties against the railroad. In so holding, the court stated:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are <u>clothed with some duty</u> in regard to the enforcement of the laws of the state, <u>and who threaten and are about to commence proceedings</u>, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

Id. at 155-56 (emphasis added). Finding that Young possessed such enforcement authority over the acts in question, and recognizing his clear threat to exercise said authority under alleged unconstitutional state law,[13] the court concluded that the Eleventh Amendment was no barrier to the suit.[14] In authorizing the suit

---

[13]The Court also observed:

> The question remains whether the attorney general had, by the law of the state, so far as concerns these rate acts, any duty with regard to the enforcement of the same. By his official conduct it seems that he regarded it as a duty connected with his office to compel the company to obey the commodity act, for he commenced proceedings to enforce such obedience immediately after the injunction issued, at the risk of being found guilty of contempt by so doing.

Id. at 160.

[14]In full, the Court said:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have <u>some connection with the enforcement of the act</u>, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a

16

against Young, the court distinguished the earlier finding of no jurisdiction in Fitts by noting that, in that case, the penalties for disobeying the act were to be collected by the individuals who were overcharged and "[n]o officer of the state had any official connection with the recovery of such penalties." Id. at 156.

Thus, Young solidified the doctrine that state officers could be sued in federal court despite the Eleventh Amendment, while simultaneously emphasizing the requirements that the officers have "some connection with the enforcement of the act" in question or be "specially charged with the duty to enforce the statute" and be threatening to exercise that duty. Id. at 157, 158.[15]


D

Young was decided almost 100 years ago. From its earliest years until the present, it has spawned numerous cases upholding, explaining, and recognizing its fundamental principle: that the

---

party. . . . The fact that the state officer, by virtue of his office, has <u>some connection with the enforcement of the act</u>, is the important and material fact. . ."

Id. at 157 (emphasis added).

[15]We note the dissent's reliance on Justice Harlan's Young dissent in its attempt to show that "it is flatly wrong to assert that Young and Fitts are consistent." Although dissents may be scholarly and persuasive to some, they are not binding law to any. The dissent's reliance upon Justice Harlan's words suggests that they, like Justice Harlan, are simply disenchanted with the fundamental principle articulated in Young.

17

defendant state official must have some enforcement connection with the challenged statute. Two years after <u>Young</u>, the Supreme Court in <u>Western Union Telegraph Co. v. Andrews</u>, 216 U.S. 165, 30 S.Ct. 286 (1910), again upheld a suit against a state official that enjoined enforcement of a state act. The act in question, which regulated fees to be paid by foreign corporations, declared that the defendant state officials "would, unless restrained by the order of the court, institute numerous actions, as they had threatened to do, for the recovery of the penalties aforesaid." <u>Id.</u> at 166. Concluding that the recent <u>Young</u> decision was "precisely applicable to the case at bar," the court found sufficient connection between the defendant state officials and the challenged statute, stating:

> The statute specifically charges the prosecuting attorneys with the duty of bringing actions to recover the penalties. It is averred in the bill, and admitted by the demurrer, that they threatened and were about to commence proceedings for that purpose.

<u>Id.</u> <u>Western Union</u>, therefore, reinforced the interpretation that <u>Young</u> requires both a close connection between the official and the act and the threatening or commencement of enforcement proceedings by the official.[16]

---

[16]<u>See</u> <u>also</u> <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 483 (1965) ("In Ex parte Young . . . , the fountainhead of federal injunctions against state prosecutions, the Court characterized the power and its proper exercise in broad terms: it would be justified where state officers '. . . threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce

More recently, other circuit courts have applied the <u>Young</u> guidelines when adjudicating the Eleventh Amendment question raised in this appeal. In <u>Children's Healthcare v. Deters</u>, 92 F.3d 1412 (6th Cir. 1996), the plaintiffs brought a civil rights action against the Ohio Attorney General and state prosecutors. The suit challenged statutes that provided exemptions from the duty to provide adequate care for children for persons who treat children by spiritual means. The court rejected federal court jurisdiction over the matter, reaffirming that "<u>Young</u> does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." <u>Id.</u> at 1415. The requirement that there be some actual or threatened enforcement action before <u>Young</u> applies has been repeatedly applied by the federal courts. <u>See</u> <u>also</u> <u>1st Westco Corp. v. School Dist. of Philadelphia</u>, 6 F.3d 108, 113 (3d Cir. 1993)(citing <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1209 n.9 (3d Cir. 1988)); <u>Long v. van de Kamp</u>, 961 F.2d 151, 152 (9th Cir. 1992); <u>Kelley v. Metropolitan County Bd. of Educ.</u>, 836 F.2d 986, 990-91 (6th Cir. 1987).

Other federal courts have invoked <u>Young</u>'s rationale when ascertaining the applicability of this narrow Eleventh Amendment exception. In <u>Gras v. Stevens</u>, 415 F.Supp. 1148 (S.D.N.Y. 1976), Judge Friendly rejected the notion that a governor's general duty

against parties affected [by] an unconstitutional act, violating the Federal Constitution . . .'").

19

to "take care that the laws are faithfully executed" is sufficient connection under Young and Fitts to dissolve the Eleventh Amendment bar. Id. at 1151-52. The court noted that "[i]n our view this would extend Ex parte Young beyond anything which the Supreme Court intended or has subsequently held." Id. at 1152.

As late as 2001, the Fourth, Ninth, Eleventh and Seventh Circuits rearticulated the criteria of Young. In Lytle v. Griffith, 2001 WL 133189, at *6 (4th Cir. Feb. 16, 2001), the Fourth Circuit, in remanding the case to determine whether the defendant Governor had the requisite connection to the challenged law, noted that "[t]he Young exception is limited, however, by its requirement that named state officials bear a special relation to the challenged statute." In Snoeck v. Brussa, 153 F.3d 984 (9th Cir. 1998), the Ninth Circuit found that the Eleventh Amendment barred a claim against the Nevada Commission on Judicial Discipline, emphasizing that compliance with the requirements of Young "must be determined under state law depending on whether and under what circumstances a particular defendant has a connection with the challenged state law." Id. at 986. The court concluded that, "[u]nder Nevada law, the Commission has no enforcement power, and therefore, it has no connection to the enforcement of the challenged law as required under Ex Parte Young." Id. at 987.

Moreover, in Summit Medical Association, P.C. v. Pryor, 180 F.3d 1326 (11th Cir. 1999), the Eleventh Circuit took note of the private civil enforcement provision of the statute in question and stated that "the doctrine of Ex parte Young cannot operate as an exception to Alabama's sovereign immunity where no defendant has any connection to the enforcement of the challenged law." Id. at 1341. Finally, the Seventh Circuit in Hope Clinic v. Ryan, 195 F.3d 857 (7th Cir. 1999), vacated on other grounds by 120 S.Ct. 2738 (2000), also observed that the statute in question was to be enforced in private litigation: "[T]he states' Attorneys General and local prosecutors have nothing to do with civil suits. Relief against the public officials therefore would be pointless even if the civil-liability provisions were problematic." Id. at 875.

E

The Supreme Court's decision in Young, appraised in the light of its predecessors Smyth and Fitts and its progeny, is thus properly understood to create a precise exception to the general bar against suing states in federal fora. This exception only applies when the named defendant state officials have some connection with the enforcement of the act and "threaten and are about to commence proceedings" to enforce the unconstitutional act. Young, 209 U.S. at 155-56.

21

We now consider the application of the <u>Young</u> principle to the facts in the case before us.

V

The present inquiry is how to read and apply the requirement that the defendants have <u>some connection with the enforcement of the Act</u>.  Specifically, the question raised before this en banc court is whether the <u>Young</u> fiction requires that the defendant state official have some enforcement powers with respect to the particular statute at issue, or whether the official need have no such enforcement powers and only need be charged with the general authority and responsibility to see that all of the laws of the state be faithfully executed.

A

As we have pointed out, the <u>Young</u> principle teaches that it is not merely the general duty to see that the laws of the state are implemented that substantiates the required "connection," but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.  For a duty found in the general laws to constitute a sufficient connection, it must "include[] the right <u>and the power</u> to enforce the statutes of the state, including, of course, the act in question . . . ." <u>Id.</u> at 161 (emphasis added).  Thus, any probe into the existence of a <u>Young</u>

22

exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute.[17]

Although the panel opinion addressed the connection of the defendants to the law in question, it nevertheless pursued a different, and we believe, seriously erroneous course. The panel applied a two-part formula to assess whether sufficient "connection" exists to warrant waiver of the Eleventh Amendment protection: (1) an analysis of "what powers the defendants wield to enforce the law in question," and (2) consideration of "the nature of the law and its place on the continuum between public regulation

---

[17]Our review of the Supreme Court's abortion cases shows that, as the dissent notes, the Court has apparently relaxed certain standing requirements in the abortion context and authorized pre-enforcement challenges to criminal abortion statutes. However, none of these cases suggest, as the dissent intimates, that the requirements of Ex parte Young have in any way been relaxed or vitiated in the abortion context. Indeed, none of the Supreme Court abortion cases expressly address the requirements of Ex Parte Young in the abortion context. This is not surprising in that in all of the abortion cases, unlike the case before us, the defendants had clear capabilities of enforcing the challenged statutes.

and private action." Okpalobi, 190 F.3d at 346.[18] We address, in turn, the flaws in each part of the panel's analysis.

1

After noting at the outset that "Act 825, on its face, does not direct the State or its officers to do anything," the panel nevertheless concluded "that the Governor and the Attorney General have powers and duties under state law sufficient to meet the minimum requirements under the Eleventh Amendment." Id. at 347.[19] The basis for this conclusion was the assertion that a mere duty to uphold the laws of the state is sufficient under Young to authorize an Eleventh Amendment waiver. The panel stated that its conclusion is discernible from a proper reading of Young and Smyth, noting that, while the Fitts Court required a "close" connection or a "special charge" between the statute and the state officer's duty,

---

[18]The panel "glean[ed]" this test from Gras v. Stevens, Federal Nat'l Mortgage Ass'n v. Lefkowitz, 383 F.Supp. 1294 (S.D.N.Y. 1974), and Allied Artists Pictures Corp. v. Rhodes, 473 F.Supp. 560 (S.D. Ohio 1979), aff'd 679 F.2d 656 (6th Cir. 1982).

[19]The panel relied on the governor's constitutional duty to "faithfully support the constitution and laws of the state," LA. CONST. art. IV, § 5(A), and the attorney general's power and right "to institute, prosecute, or intervene in any civil action or proceeding[.]" Id., art. IV, § 8. See Okpalobi, 190 F.3d at 346.

24

the Young Court adopted the more relaxed connection requirements outlined in Smyth.[20]

In essence, the panel suggests that there is some conflict between Fitts, on the one hand, and Smyth and Young, noting that "[t]o the extent that there is tension between Fitts's focus on the state officials' express enforcement power and the later articulation in Young, we are controlled by the Smyth doctrine and the unequivocal holding of Young that a state officer's connection with the enforcement of the challenged act can '[arise] out of the general law . . . so long as it exists.'" Id. at 344 (citing Young, 209 U.S. at 157). We do not, however, find this tension in the Smyth-Fitts-Young triad. The resolution in each of these three cases was dictated, not by the application of a different legal rule, but by the particular statutes and the connection to those statutes of the defendant state officials. The challenged statutes in Young and Smyth (wherein the defendants had enforcement powers over the railway acts) stand in sharp contrast to the statute in Fitts (wherein the defendants were granted no enforcement powers

---

[20]The panel noted the Young Court's statement that "[t]he doctrine of Smyth v. Ames was neither overruled nor doubted in the Fitts case." 209 U.S. at 156.

whatsoever with respect to the statute).[21]  Fitts involved the

establishment of toll rates for a single bridge.  The act in

question was self-enforcing; if the operators of the bridge charged

an excessive toll, the statute entitled the aggrieved to sue for

twenty dollars.[22]  Thus, the court in Young characterized the Fitts

statute as one in which

> [n]o officer of the state had any official connection
> with the recovery of such penalties. . . . As no state
> officer who was made a party bore any close official
> connection with the act fixing the tolls, the making of
> such officer a party defendant was a simple effort to
> test the constitutionality of such act in that way, and
> there is no principle upon which it could be done.  A
> state superintendent of schools might as well have been
> made a party.

Id. at 156.  In differentiating the "general duty" authority of the

officials in Fitts, which the court found was insufficient to

_____

[21]The Fitts Court specifically recognized this critical
difference in distinguishing the facts of Smyth and finding that
the defendants in that case were "specially charged with the
execution" of the challenged statute.  Fitts, 172 U.S. at 529.  It
would seem that this distinction between Smyth and Fitts, noted by
the Supreme Court, calls into question the panel's understanding of
Smyth as support for its interpretation of Young as imposing a
lesser legal standard than Fitts.

[22]The statute challenged in Smyth authorized not only private
suits for overcharges, but also enumerated a system of substantial
and escalating fines to be paid to the state.  See 169 U.S. at 517.
Thus, the statute involved liability to the state in addition to
private contractual liability.  A system of fines implies an
enforcement power in the state.

26

dissolve the Eleventh Amendment bar, the Young Court noted that "[t]he officers in the Fitts case occupied the position of having no duty at all with regard to the act . . . ." 209 U.S. at 158. The court then referenced with approval a distinction noted by the court in Fitts, wherein the facts in Fitts were clearly distinguished from the facts in Smyth and Reagan v. Farmer's Loan & T. Co., 154 U.S. 362, 14 S.Ct. 1047 (1894):

> In [Smyth and Reagan] the only wrong or injury or trespass involved was the threatened commencement of suits to enforce the statute as to rates, and the threat of such commencement was in each case regarded as sufficient to authorize the issuing of an injunction to prevent the same. The threat to commence those suits under such circumstances was therefore necessarily held to be equivalent to any other threatened wrong or injury to the property of a plaintiff which had theretofore been held sufficient to authorize the suit against the officer.

Young, 209 U.S. at 158.[23]

---

[23]The immediately following sentence, in the same paragraph, reads:

> The being specially charged with the duty to enforce the statute is sufficiently apparent when such duty exists under the general authority of some law, even though such authority is not to be found in the particular act. It might exist by some reason of the general duties of the officer to enforce it as a law of the state.

This use in Young of the "specially charged" language from Fitts reinforces the holding in Fitts and clearly suggests that the court did not intend the "some connection" to be without authority to enforce the statute.

27

Considering the obvious enforcement potential that the defendant Young had under the Minnesota statute, the panel's interpretation of the "some connection" language as necessitating only an undefined, inchoate, general duty to see that all of the laws of the state are enforced exceeded any reasonable interpretation of <u>Young</u>. Indeed, <u>Young</u> does not reject the "special charge" language in <u>Fitts</u>;[24] instead, <u>Young</u> merely allows the "special charge" to be drawn implicitly from the laws of the state, rather than requiring that it be stated explicitly in the challenged statute. Thus, the correct interpretation of <u>Young</u> concludes that no such special charge need be found directly in the challenged statute to meet the requisite "some connection" so long as there is sufficient indicia of the defendant's enforcement

---

[24]We note especially the <u>Young</u> Court's adoption of the "special charge" language from <u>Fitts</u>: "The being specially charged with the duty to enforce the statute is sufficiently apparent when such duty exists under the general authority of some law. . ." <u>Young</u>, 209 U.S. at 158.

powers found elsewhere in the laws of the state.[25]   This

interpretation finds support in the following language in <u>Young</u>:

> It has not, however, been held that it was necessary that
> such duty should be declared in the same act which is to
> be enforced.  In some cases, it is true, the duty of
> enforcement has been so imposed . . . but that may
> possibly make the duty more clear; if it otherwise
> exist[s] it is equally efficacious.

209 U.S. at 157.

Thus, the panel erred by not recognizing that <u>Fitts</u>'s "special

charge" requirement is an essential part of <u>Young</u>'s holding.  <u>See</u>

<u>also</u> <u>Gras</u>, 415 F.Supp. at 1151 (characterizing the statute in <u>Young</u>

as "implicitly charg[ing] [the attorney general] by statute with

the duty of collecting an allegedly unconstitutional tax.").  This

---

[25]This conclusion is essentially the one reached by Judge
Friendly in <u>Gras</u>:

> The argument would continue that although <u>Fitts v. McGhee</u>
> held that the bar of the Eleventh Amendment could not be
> avoided by suing state officers in the absence of "any
> special relation" on their part "to the particular
> statute alleged to be unconstitutional," this was altered
> by the statement in <u>Ex parte Young</u> [regarding "some
> connection"].  In our view this would extend <u>Ex parte</u>
> <u>Young</u> beyond anything which the Supreme Court intended or
> has subsequently held. . . . [W]e know of no case in
> which the general duty of a governor to enforce state
> laws has been held sufficient to make him a proper party
> defendant in a civil rights action attacking the
> constitutionality of a state statute concerning . . .
> private civil actions.

415 F.Supp. at 1152.

29

failing led to the panel's conclusion that the general charge of the governor and attorney general to implement and enforce all of the laws of the state satisfies the requirements of Young.

In sum, Young does not minimize the need to find an actual enforcement connection--some enforcement power or act that can be enjoined--between the defendant official and the challenged statute. Instead, it provides that this connection can be found implicitly elsewhere in the laws of the state, apart from the challenged statute, so long as those duties have the same effect as a "special charge" in the statute.

2

We turn now to the second prong of the panel's test--the place of Act 825 on a public-to-private "continuum." The panel concluded that Act 825 implicates "public" action because "the purpose and effect of the Act is to prevent women from obtaining legal abortion." Okpalobi, 190 F.3d at 347. This continuum element was derived from Allied Artists Pictures Corp. v. Rhodes, 473 F.Supp. 560 (S.D. Ohio 1979), aff'd 679 F.2d 656, 665 n.5 (6th Cir. 1982) (holding that statutory regulation of private contracting with respect to movies amounted to state regulation of movie producers and distributors). Notwithstanding the equivocal nature of Allied

30

<u>Artists</u>' "continuum" holding,[26] the majority seized upon this result

---

[26]<u>Allied Artists</u> states:

Thus the problem now before the Court becomes that of properly placing this case on the continuum. Defendants would argue that since the Act purports to regulate contractual rights between private parties, namely motion picture distributors and exhibitors, there is no realistic potential that the defendant governor would act to enforce the statutory rights which could be vindicated by private action. Plaintiffs on the other hand would claim that the alleged substantial and immediate impact upon them of the Act is tantamount to direct state regulation which could reasonably require the governor's attention under his general duty to see to the faithful execution of the laws. . . . I believe it can be reasonably maintained that the Act amounts to state regulation of movie producers and distributors doing business in Ohio. Presumably, then, this exercise of the state's regulatory power is designed to implement and serve the public interest of Ohio. The Court is aware that there is no criminal sanction attached to the Act, and also that plaintiffs could possibly await a dispute with an exhibitor and sue, raising there the question of the Act's constitutionality. However, that begs the question in the case at bar. The pertinent question is: does the governor of Ohio, as the chief executive of the state, have an interest in the enforcement of the Act? Or, on the other hand, is this simply an Act near the <u>Gras</u> end of the continuum where the public interest is not crucial, the dispute is such that the governor's interest is absent, and the matter can be adequately decided in an action between concerned private parties? The question is difficult; the real thrust of the Act is somewhat obscure on its face. However, in ruling on this motion to dismiss, the Court must view the complaint most favorably for plaintiffs. Thus, in the exercise of great caution . . . I hold that plaintiffs have alleged facts sufficient to invoke the <u>Young</u> fiction and to avoid the Eleventh Amendment bar.

and compared it to an act affecting availability of abortion services: "We place such interference [with abortion rights] on the Allied continuum near the end closest to laws respecting the voting rights of citizens [see Socialist Workers Party v. Rockefeller, 314 F.Supp. 984 (S.D.N.Y. 1970), aff'd, 400 U.S. 806 (1970)], rather than alongside procedural aspects of domestic relations law [see Gras, 415 F.Supp. 1148]." Okpalobi, 190 F.3d at 347.

The first weakness in the panel's use of this analysis to find a sufficient connection between the state officials and Act 825 is its almost exclusive reliance on Allied Artists. The sum total of the panel's support lies in two district court cases, Allied Artists and Federal National Mortgage. Allied Artists is not only not binding on this circuit, but it seems to have been rejected as binding authority in its own circuit. See Children's Healthcare, 92 F.3d at 1414-15, 1416; see also Kelley v. Metropolitan County Bd. Of Educ., 836 F.2d 986, 990-91 (6th Cir. 1987). In Children's Healthcare, the Sixth Circuit highlighted Allied Artists' tension

473 F.Supp. at 569. Of course, presumably every statute is designed to serve the public interest in some way or another. More importantly, the placement of this statute on the "public" side of the continuum seems not to have been much of a weighed decision at all, given the obvious deference to the plaintiff's argument in a Rule 12(b)(6) motion. Allied Artists is, however, the sum total of the panel's support for its adoption of a "continuum" prong and its placement of Act 825 on the "public" side of the continuum.

with Supreme Court jurisprudence, apparently rejecting the holding that "general duty" provisions are sufficient for purposes of Eleventh Amendment waiver. See 92 F.3d at 1416. See also Kelley, 836 F.2d at 990-91. Furthermore, even Allied Artists--the panel's sole support for its "continuum" prong--does not support the panel's argument as to the degree of "connection" required under Young. Allied Artists states:

> Although I disagree with Gras insofar as it declines to find Young enforcement power in the governor's general duty to see to the execution of state laws, I agree with the Gras result. Furthermore, I believe to be accurate Judge Friendly's evaluation that the cases which have permitted a governor to be joined as a defendant concerned the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual. This valid limitation serves to preclude parties from testing the constitutionality of state legislation by simply naming the governor as defendant, a practice which if unchecked would effectively eviscerate the Eleventh Amendment. Thus, to satisfy the Young fiction, as I understand it, not only must there be a state officer who has a connection with the enforcement of the challenged statute, but there must also be a real, not ephemeral, likelihood or realistic potential that the connection will be employed against plaintiffs' interests.

473 F.Supp. at 568 (emphasis added). Thus, the panel's reliance on Allied Artists places it in the awkward position of relying on a case in support of the second part of its analysis when that case rejects the panel's conclusion as to the first part.

33

Second, the panel's approach ignores the 'state/individual' vs. 'predominately private/private' distinction set forth in Gras: "[These cases finding no Eleventh Amendment immunity] have been concerned with the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual . . ." 415 F.Supp. at 1152. Indeed, the propriety of this distinction was echoed in Allied Artists. See 473 F.Supp. at 568. The panel's thin retort is simply that Act 825 is "designed to implement and serve the public interest of the state." Okpalobi, 190 F.3d at 347 (citation omitted). This tautological reasoning, however, can easily be applied to every statute: What statute of general application is not so designed? Even those statutes on the opposite end of the continuum (e.g., domestic relations law in Gras) are presumably enacted to serve the public's interest in the private ordering of individuals. We therefore doubt whether this analysis serves any real use in determining whether a case improperly tests the constitutionality of a state statute. If Act 825, a private tort statute, is on the public interest side of the continuum, almost anything can be said to affect the public interest. For this and other reasons, we reject the panel's use of this rationale to resolve the Eleventh Amendment question.

B

34

In sum, the panel generated a new two-pronged test spun out of hardly more than a wisp of authority (a single district court's ruling), while ignoring critical factors examined by virtually all prior Eleventh Amendment jurisprudence. For example, we note that the panel's reading failed to note that the necessary fiction of <u>Young</u> requires that the defendant state official be acting, threatening to act, or at least have the ability to act. <u>Young</u>, 209 U.S. at 159 (noting that the fiction applies "where an official claims to be acting under the authority of the state."). It is this unconstitutional conduct, or at least the ability to engage in the unconstitutional conduct, that makes him no longer a representative of the sovereign. Without at least the ability to commit the unconstitutional act by the official defendant, the fiction cannot be sustained. <u>See</u>, <u>e.g.</u>, <u>Fitts</u>, 172 U.S. at 530; <u>Children's Healthcare</u>, 92 F.3d at 1415-16. Indeed, if there is no act, or potential act, of the state official to enjoin, an injunction would be utterly meaningless. Here, there is no act, no threat to act, and no ability to act.

VI

A

We take a moment now to address the dissent's view of the Eleventh Amendment question in this case. The dissent

35

substantially departs from the panel majority opinion, abandoning many of the views expressed therein and raising theories apparently dismissed by the plaintiff-appellees.[27]  The panel opinion, as we have noted, exhibited as its centerpiece <u>Allied Artists</u>, a twenty year old Ohio district court case.  The dissent now jettisons <u>Allied Artists</u> as support for the panel's novel position and turns to Title 40 of the Louisiana Revised Statutes, a statutory scheme that attempts to review, regulate, oversee, and partially fund medical malpractice claims.  <u>See</u> 22C La. Rev. Stat. Ann. § 40:1299. It quickly becomes clear, however, that Title 40 is an even less reliable ally than was <u>Allied Artists</u> for the position that these defendants have enforcement powers with regard to Act 825.

This is the essence of the dissent's argument as best we understand it:  Title 40 applies to all medical malpractice claims;[28] the Patients Compensation Fund Oversight Board ("PCFOB") must review all malpractice claims to determine if they qualify for

---

[27]None of the plaintiff-appellees appear willing to rely on the dissent's theory.  Indeed, the appellees expressly observe in their briefs that the medical malpractice scheme does <u>not</u> apply to any cause of action under Act 825.

[28]The dissent asserts that "[u]nder Title 40's medical malpractice system, <u>all</u> malpractice claims against private and public health care providers must be reviewed by a medical review panel before the claimant can file suit in court." (emphasis added).

the damage caps and other benefits provided by Title 40; this oversight authority means that the PCFOB would review all medical malpractice claims based on or related to abortion claims; the PCFOB would have discretionary authority to deny benefits of Title 40 to defendant doctors for procedures determined by the Board to be covered by Act 825; and, because the Governor appoints members of the PCFOB, and because appointees of the Attorney General must approve certain payments ultimately determined to be payable from the Self-Insurance Fund--all the aforementioned acts authorized by Title 40--each of the defendants has enforcement powers with respect to Act 825. The dissent makes this argument notwithstanding the express provision of Act 825 that "[t]he laws governing medical malpractice or limitations of liability thereof provided in Title 40 of the Louisiana Revised Statutes of 1950 <u>are not applicable to this Section</u>." <u>See</u> § 2800.12(C)(2) (emphasis added).[29] Furthermore, the dissent makes this argument even though

---

[29]The dissent incorrectly observes that Act 825 "remov[es] abortion doctors from the umbrella of medical malpractice protections." Act 825 does not exempt <u>abortion doctors</u> from the provisions of Title 40. Rather, <u>all claims brought pursuant to Act 825</u> are exempt from Title 40. It is upon this initial flawed foundation that the entirety of the dissent's argument is constructed.

37

no official connected with Title 40 has been named as a defendant in this case.

Very little need be said about this patently untenable argument.  We need not draw attention to the fact that, even under the dissent's argument, the defendants who have been sued in this case have no <u>enforcement connection</u> with Title 40, much less the statute at issue (Act 825).  The most obvious--and fatal--flaw in the dissent's effort to connect Act 825 to Title 40 is that the argument is premised and dependent upon a plainly false assumption: the assumption that the agencies operating under Title 40 have jurisdiction, authority, or discretion _ever_ to review or consider any claims brought under Act 825.  Act 825 creates a specific cause of action; Act 825 provides that claims brought under the statute are _not_ subject to Title 40; consequently, any governmental bodies or agents acting under Title 40 have no authority or jurisdiction-- that is, enforcement powers--over claims brought under Act 825.  In short, the foundation of the dissent's argument, to wit, that "[u]nder Title 40's medical malpractice system, all malpractice claims against private and public health care providers must be reviewed by a medical review panel," is false--the actual fact being that Title 40 applies to all medical malpractice claims _except_ those brought pursuant to Act 825.  There is therefore no

connection between Title 40 and Act 825.  In concluding, however, we emphasize that, notwithstanding the dissent's newest theory that attempts to relate Act 825 to Title 40, we should not be diverted from the crucial and determinative consideration under <u>Ex parte Young</u> and its progeny: These defendants have no ability to enforce Act 825, a purely private tort statute, which can be invoked only by private litigants.

B

We turn now to comment on the various authorities addressed by the dissent.  We would first note that the dissent fails to cite any case in which a federal court enjoined enforcement of a statute even remotely like Act 825--that is, one with private civil, but no criminal penalties.  In every case cited by the dissent to support its claim that an injunction was proper in this case, there were simply no Eleventh Amendment or Article III problems that would bar the court from asserting jurisdiction over the complaint for this reason: federal jurisdiction plainly existed over the claims for injunctive relief to strike the <u>criminal</u> provisions of the statutes at issue in those cases.[30]  When there were also civil provisions

_____

[30]<u>See</u>, <u>e.g.</u>, <u>Causeway Med. Suite v. Foster</u>, 221 F.3d 811 (5th Cir. 2000), <u>aff'g</u>, <u>Causeway Med. Suite v. Foster</u>, 43 F.Supp. 2d 604, 609 (E.D. La. 1999); <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>, 505 U.S. 833, 909, 112 S.Ct. 2791 (1992);

39

contained in these statutes they were, without analysis, swept up and bundled as one package with the struck criminal provisions.  In no case cited by the dissent did the court address the civil provisions separately under an Ex parte Young analysis, as we are called upon to do today.  Indeed, in assessing the value of those cases to the issues before us today, we must conclude that it is determinative that these cases fail to even mention Ex parte Young.

In sum, nothing argued or cited by the dissent suggests that there is any enforcement connection between these defendants--the Governor and the Attorney General--and Act 825 that satisfies either of the requirements of Ex parte Young.[31]  It is clear

---

Colautti v. Franklin, 439 U.S. 379, 381, 99 S.Ct. 675 (1979); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 83-84, 96 S.Ct. 2831 (1976); Karlin v. Foust, 188 F.3d 446, 456 (7th Cir. 1999); Women's Medical Prof'l Corp. v. Voinovich, 130 F.3d 187, 191 (6th Cir. 1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1454 (8th Cir. 1995).

[31]We also briefly respond to Judge Benavides' concurring and dissenting opinion.  We understand that opinion to suggest that we should "pragmatically" apply Ex Parte Young in a declaratory judgment action, without regard to the fact that no case has ever rejected the Young fiction as the only means of avoiding the Eleventh Amendment; that we should assume that the Eleventh Amendment makes an exception for the Declaratory Judgment Act for any case that seeks to enforce a federal right denied by the state, when this position has never been held by any court;  that we should find no Article III controversy in this case as to the injunction, and then turn and find a controversy on the same set of facts, including the same parties, alleging the same claim and seeking the same resolution via a declaratory judgment; and that we

should assume that the Declaratory Judgment Act provides an independent cause of action, notwithstanding that the law makes clear that--although the Declaratory Judgment Act provides a remedy different from an injunction--it does not provide an additional cause of action with respect to the underlying claim. See Earnest v. Lowentritt, 690 F.2d 1198, 1203 (5th Cir. 1982). Neither case law or the Constitution allows for this creative analysis.

The opinion makes the novel and cryptic contention that "the Supreme Court's modern standing doctrine has subsumed the connection inquiry [of Young]." The revelation that the connection inquiry of Young is no longer applicable law would come as a surprise to the numerous federal courts that continue to apply this connection inquiry as the binding law of the land. See, e.g., Lytle v. Griffith, 2001 WL 133189 (4th Cir. Feb. 16, 2001); Confederated Tribes & Bands of the Yakama Indian Nation v. Locke, 176 F.3d 467 (9th Cir. 1999); Snoeck v. Brussa, 153 F.3d 984 (9th Cir. 1998); Luckey v. Harris, 860 F.2d 1012 (11th Cir. 1988); Finberg v. Sullivan, 634 F.2d 50 (3d Cir. 1980); Shell Oil Co. v. Noel, 608 F.2d 208 (1st Cir. 1979). That the doctrine of standing has "subsumed" the connection inquiry under Young would likely surprise the Supreme Court itself, which has never questioned the continuing viability of Young and, indeed, has recently reaffirmed the vitality of the doctrine. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 262, 117 S.Ct. 2028 (1997). We note that the Supreme Court has frequently emphasized its unwillingness to recognize the overruling of its precedent by implication. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (citation omitted).

This opinion effectively asks us to jettison the traditional connection inquiry outlined in Young and hold that the state qua state may be sued in federal court when the plaintiff, in a declaratory judgment action, seeks to assert federal constitutional rights against the state because the Fourteenth Amendment trumps the Eleventh Amendment. To borrow the concurring and dissenting

41

therefore to this en banc court, and we hold, alternatively, that

the defendants in this case enjoy Eleventh Amendment immunity from

this suit.[32]


VII

---

opinion's words:  "That [is] beyond the power of this intermediate
court."

[32]We are at a loss to grasp what drives Judge Higginbotham's
concurring opinion, in which he states that our effort to resolve
the crucial Eleventh Amendment question in this case "should not
have been undertaken."  Despite its opposition, the concurring
opinion in no way hints at where our treatment of Ex parte Young
runs astray of the established law and does not deny that the issue
has been central to both the panel opinion and these en banc
proceedings.
    Indeed, the opinion seems to ignore the prominence, not to
mention the importance, of that issue in this case and the purpose
of the en banc court.  The panel opinion based its holding on
Young.  This court voted for en banc to consider the Eleventh
Amendment issues that the parties and the panel had raised.  The
State has vigorously asserted its Eleventh Amendment immunity in
both its petition for rehearing and in its en banc briefs.  The
plaintiff-appellees addressed the Young issue before this en banc
court as well.  Therefore, once this case reached the full court,
the State was forcefully claiming its Eleventh Amendment immunity,
and the plaintiff-appellees were vigorously arguing the Young
exception.  The purpose of the en banc court is to clarify the law
when a "panel decision conflicts with a decision of the United
States Supreme Court" or the case "involves one or more questions
of exceptional importance".  Fed. R. App. P. 35(b)(1).  Under the
circumstances of this case, it would be difficult, if not
irresponsible, to remain silent on the panel's and the dissent's
misreading of the Young exception.

42

Now that we have addressed the Eleventh Amendment issues that have been presented in this case, we turn to the question of jurisdiction under Article III.  Recently, the Supreme Court, when confronted with both an Eleventh Amendment and an Article III question, chose to decide the case based on Article III jurisdiction.  See Calderon v. Ashmus, 523 U.S. 740, 745, 118 S.Ct. 1694 (1998) ("[We] have decided that we must first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited.").[33]

_____

[33] In Calderon, the Ninth Circuit had rejected the defendant state officers' Eleventh Amendment defense and affirmed a declaratory judgment regarding a portion of the Antiterrorism and Effective Death Penalty Act of 1996.  The Supreme Court, which had granted certiorari on the court's rejection of the defendants' Eleventh Amendment defense, passed the opportunity to address the question of Eleventh Amendment immunity, and decided the case based on Article III standing.

Whether the Supreme Court would come to the same conclusion were it faced with the case before us, where the issue on appeal is the propriety of an injunction rather than a judgment under the Declaratory Judgment Act, is surely open to question.  We note that the authority cited by the Calderon court for first addressing standing does not support the proposition that courts must always address standing before considering the Eleventh Amendment.

The Court first relied on Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557 (1982).  In Patsy, the Court decided not to address the Eleventh Amendment issue in part because the State had expressly requested that the Court address the substance of the claim.  See Id. at 515.  It is relevant to our case to note, however, that one of the reasons the Court decided to look past the Eleventh Amendment and to address the merits of the exhaustion claim was that the exhaustion issue was "decided below and vigorously pressed in this Court."  Id.  Here, too, have the

43

<u>Calderon</u> does not hold that a court always must, or even always should, decide the Article III issues before addressing Eleventh Amendment issues.  Nevertheless, given that the Supreme Court has followed this path in a case that has similarities to today's case, it is not inappropriate for us to examine, and, if thereby warranted, to decide this case based on the limitations Article III imposes on federal courts.

Under Article III of the Constitution, the federal courts have jurisdiction over a claim between a plaintiff and a defendant only if it presents a "case or controversy."  This is a "bedrock

State of Louisiana and the plaintiff-appellees "vigorously pressed" the Eleventh Amendment issue before this en banc court.

Second, the <u>Calderon</u> court relied on <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 117 S.Ct. 2028 (1997), in deciding to address Article III jurisdiction before the Eleventh Amendment. Although <u>Coeur d'Alene</u> holds that "a State can waive its Eleventh Amendment protection", that case does not suggest that the Eleventh Amendment is anything less than an actual restriction on the Article III jurisdiction of the federal courts.  <u>See</u> <u>Id.</u> at 270 (noting that "Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction.").

Finally, it must be recognized that, on several other occasions, the Supreme Court has not addressed the standing issue prior to addressing the Eleventh Amendment, despite the fact that standing was an issue in these cases.  <u>See</u>, <u>e.g.</u>, <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 73, 116 S.Ct. 1114 (1996); <u>Edelman v. Jordan</u>, 415 U.S. 651, 658-59, 94 S.Ct. 1347 (1974).  Indeed, the Supreme Court has stated in unequivocal words that "the Eleventh Amendment [stands] for the constitutional principle that state sovereign immunity limit[s] the federal courts' jurisdiction under Article III."  <u>Seminole Tribe</u>, 517 U.S. at 64; <u>See</u> <u>also</u> <u>Coeur d'Alene</u>, 521 U.S. at 270.

44

requirement." Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312 (1997). In this way, the power granted to federal courts under Article III "is not an unconditioned authority to determine the constitutionality of legislative or executive acts." Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752 (1982).

In order to establish a case or controversy sufficient to give a federal court jurisdiction over their claims, plaintiffs must satisfy three criteria. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130 (1992). First, they must show that they have suffered, or are about to suffer, an "injury in fact." Second, "there must be a causal connection between the injury and the conduct complained of." Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (citation omitted). If any one of these three elements--injury, causation, and redressability-is absent, plaintiffs have no standing in federal court under Article III of the constitution to assert their claim.

In the district court, the defendants did not raise the question of whether the plaintiffs had an Article III case or controversy with them, the Governor and the Attorney General, and the district court did not consider this jurisdictional question.

The defendants argued only that the plaintiff doctors and clinics lacked standing to pursue their patients' rights. In rejecting that contention, the district court held that "[g]iven the relationship between the intervenors and their patients, and given the obstacles which prevent pregnant women from challenging this statute, including a desire for privacy and the imminent mootness of their claims, intervenors may assert third party standing and raise the right of their patients." Okpalobi v. Foster, 981 F.Supp. 977, 980 (E.D. La. 1998). The panel upheld that determination, finding that "the Plaintiffs have alleged an injury in fact, including components of causation and redressability, sufficient to make their claim a case or controversy subject to the federal courts' Article III jurisdiction." Okpalobi, 190 F.3d at 350. The panel further determined that plaintiffs could properly assert third-party standing on behalf of their female patients because the plaintiffs "have the requisite commonality and congruence with their patients' interests to establish standing to assert their right to make abortion decisions free of undue burden by the State of Louisiana." Id. at 353.

In addressing the question of federal jurisdiction under Article III, the panel, disregarding that the defendants (the Governor and the Attorney General) had caused no injury to the

plaintiffs and could never themselves cause any injury under the private civil scheme, nevertheless concluded that, because "[i]t is well established that a claim of direct economic harm visited on abortion providers by a statute is adequate to satisfy the injury-in-fact requirement," the plaintiffs could assert standing for themselves. Id. at 350. Furthermore, the panel essentially passed over the causation and redressability requirements, stating only:

> We are convinced that Article III does not require a plaintiff to plead or prove that a defendant state official has enforced or threatened to enforce a statute in order to meet the case or controversy requirement when that statute is immediately and coercively self-enforcing.

Id. at 349.

The central weakness of the panel's argument, and the fatal flaw of the dissent's argument that follows this opinion, is that, notwithstanding that the defendants are powerless to enforce Act 825 against the plaintiffs (or to prevent any threatened injury from its enforcement), the plaintiffs yet must show (1) how these impotent defendants play a causal role in the plaintiffs' injury and (2) how these defendants can redress their alleged actual or threatened injury. The panel's reference to the self-enforcing nature of Act 825 is inapposite to the analysis of whether the plaintiffs have any controversy with these defendants. That is to

47

say, the panel confuses the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants--that is, the Governor and the Attorney General. This confusion allows the panel to state further: "The Plaintiffs' assertion that they will be forced to discontinue offering legal abortions to patients because of the untenable risks of unlimited civil liability under an unconstitutional Act, sets forth a justiciable case or controversy between the plaintiffs and the Governor and Attorney General of Louisiana." Id. Once the coercive impact of the statute (coercive in that it exposes plaintiffs to unlimited tort liability by individual plaintiffs) is understood to be distinct from the coercive power of state officials (for example, if the State could institute criminal or civil proceedings under the Act), the panel's finding of causation here is without a basis. The panel's own citation to Lujan recognizes that Article III requires "a causal connection between the injury and the conduct complained of . . ." 504 U.S. at 560-61 (emphasis added)--that is, here, a connection between the unwarranted monetary judgment (the injury) and the prosecution of a lawsuit under Act 825 by a private civil litigant (the conduct). The plaintiffs have never suggested that any act of the defendants has caused, will cause, or could possibly cause any injury to them.

The requirements of <u>Lujan</u> are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute. <u>See</u> <u>Muskrat v. United States</u>, 219 U.S. 346, 31 S.Ct. 250 (1911) (holding that the United States as defendant had no interest adverse to the claimants); <u>Gritts v. Fisher</u>, 224 U.S. 640, 32 S.Ct. 580 (1912) (finding that the defendant state official was charged with specific duties to enforce the challenged statute and was therefore sufficiently adverse to the plaintiffs to create an Article III controversy).

The plaintiffs also fail to satisfy the "redressability" requirement of the case or controversy analysis. For all practical purposes, the injunction granted by the district court is utterly meaningless.[34] The governor and attorney general have no power to redress the asserted injuries. In fact, under Act 825, no state official has any duty or ability to do <u>anything</u>. The defendants have no authority to prevent a private plaintiff from invoking the

_____

[34]The district court enjoined the <u>statute</u>. An injunction enjoins a defendant, not a statute. The dissent does not suggest to us the wording of the proposed injunction against these defendants that it would enter to bar either private plaintiffs from suing under the statute or courts from hearing such suits.

statute in a civil suit.[35]  Nor do the defendants have any authority

under the laws of Louisiana to order what cases the judiciary of

Louisiana may hear or not hear.  Because these defendants have no

powers to redress the injuries alleged, the plaintiffs have no case

or controversy with these defendants that will permit them to

maintain this action in federal court.  See Muskrat, 219 U.S. at

346.[36]

In addressing Article III jurisdiction, the dissent focuses on

the injury component of the case or controversy requirement,

_____

[35]The dissent cites Causeway Medical Suite v. Ieyoub, 109 F.3d
1096 (5th Cir. 1997), for the proposition that these plaintiffs
have a case or controversy against the Governor and Attorney
General in this case.  In Causeway, however, two additional named
defendants (the Secretary of the Department of Health and Hospitals
and the Secretary of the Department of Social Services) appear to
have possessed some enforcement connection with the challenged
statute.  See id. at 1100-01.  The opinion, however, does not
analyze in any detail the case or controversy issue, and the
precise role that each defendant played in enforcing the statute in
question is not clear.  See id. at 1102.  To the extent, however,
that Causeway might stand for the proposition that the defendants
need have no causal connection to the plaintiff's injury and powers
to redress the injury in order to create an Article III case or
controversy, that case is overruled.

[36]The cases cited by the dissent that purport to authorize
standing under these facts are hardly persuasive in deciding the
jurisdiction of the federal courts in the case before us.  In each
of those cases, a case or controversy existed between the
plaintiffs and defendants because of the presence of criminal
liability provisions, fully enforceable by the state officials who
were sued.  There is no such basis here that would provide an
Article III home.

50

arguing that this component has been "visibly relaxed" in abortion cases.  We do not challenge that the plaintiffs are suffering a threatened injury.  We only say that the injury alleged by the plaintiffs is not, and cannot possibly be, <u>caused</u> by the defendants--that is, these defendants will not file and prosecute a cause of action under Act 825 against these plaintiffs; and that their injury cannot be <u>redressed</u> by these defendants--that is, these defendants cannot prevent purely private litigants from filing and prosecuting a cause of action under Act 825 and cannot prevent the courts of Louisiana from processing and hearing these private tort cases.[37]  In this way, the dissent makes much the same argument--and thus incorporates the same fatal flaw--as did the panel opinion.  It continues to confuse the coercive impact of the statute itself and the ability--or the absence of ability--of the Governor and Attorney General to cause or redress the impact of the statute on the plaintiffs.

Indeed, the dissent is silent on how the defendants cause the plaintiffs' alleged injury.  The only response the dissent seems to make concerning redressability is that the Governor can provide

---

[37]The cases cited by the dissent to support this relaxation of the injury requirement do not in any way minimize the necessity of causation and redressability to establish an Article III case or controversy.

some relief to physicians sued under Act 825 by "order[ing] his agents and subordinates to disregard Act 825 in reviewing civil claims against women's health care providers and making their legal and factual recommendations as to liability and damages." This argument is unavailing. First, this response overlooks the elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place. If the defendant Governor or Attorney General has no authority under state law to issue a specific directive, then the plaintiff might as well sue any state officer who, in turn, could direct any other state officer to carry out the injunction orders; or, under the dissent's reasoning, why not simply order the defendant Governor to decree that no court may entertain any suit brought under Act 825? The dissent, of course, cites no authority for its assertion that the Governor is clothed with power to order the state agencies that administer Title 40 to act in a specified manner with respect to a class of cases. This is not to say that the administrators of Title 40 themselves could not be enjoined to do a particular act that was within their authority--but these plaintiffs must sue those individuals authorized to exercise the orders of the injunction.

52

Second, the redress sought by the plaintiffs' complaint is to eliminate the initiation of any and all lawsuits under Act 825--there is nothing in their complaint indicating in any way that plaintiffs seek the limited liability benefits of Title 40 for lawsuits brought under Act 825. Like the entirety of the dissent's "Title 40" argument, this suggestion makes its first appearance in the dissent that follows this opinion, notwithstanding that this case has been pending for nearly four years. The plaintiffs' claim is not that Act 825 is constitutional <u>so long as</u> claims brought thereunder are subject to the provisions of Title 40. Indeed, the plaintiffs never mention Title 40, except to say that it is not applicable to any claims brought under Act 825. Their argument is that <u>any</u> cause of action alleged under Act 825 is barred as unconstitutional. Thus, there is no redress for the claimed injury resulting from the application of this unconstitutional statute--that is, the filing and prosecution of a private civil action under Act 825--that can be provided by these defendants, even under this latest theory of redressability.

Third, we should point out, at the risk of being repetitive, that the matter of causation remains unsatisfied. At best, the Governor only appoints some of the administrators of Title 40, and the Attorney General appoints legal counsel for the Self-Insurance

53

Fund.  See La. Rev. Stat. Ann. §§ 39:5(A); 40:1299.44(D);
39:1533(B); 39:1535(B)(6).  This appointive power of the defendants
inflicts no injury on the plaintiffs.  That is to say, it is not
the Governor or the Attorney General who inflicts the claimed
injury--it is the private plaintiff, bringing a private lawsuit
under Act 825, who causes the injury of which the plaintiffs
complain.

Thus, even if we take it as true that abortion cases are
different from other cases concerning the requirements for injury
for Article III purposes, it is in this way--causal connection and
redressability–that the dissent's authorities nevertheless remain
lacking.[38]  In those cases, where the plaintiffs' injury may not

---

[38]The dissent cites Mobil Oil Corp. v. Attorney General, 940
F.2d 73 (4th Cir. 1991), as support for its claim that causation
and redressability can exist even where a challenged statute
provides only a private tort cause of action.  The court in Mobil
Oil did indeed find a controversy between the plaintiff and the
Attorney General of Virginia in that case.  However, that
controversy was founded upon the Attorney General's explicit
statutory authority, as granted via the challenged act itself, to
"investigate and bring an action in the name of the Commonwealth to
enjoin any violation of [the statute]."  Va.Code § 59.1-68.2.  This
authority--granting the defendants some sort of enforcement power
against the plaintiffs so as to create a case or controversy under
Article III--simply does not exist in the case before us.  The
dissent's interpretation of Mobil Oil as saying that this express
statutory authority, non-existent in the case before us, was
"irrelevant" to a finding of controversy between the plaintiff and
Attorney General is plainly wrong.

have been imminent, the defendants had the <u>ability</u> to cause and to redress the plaintiffs' injuries.[39]  Here, that is plainly not the case.  Consequently, there is no case or controversy between these plaintiffs and defendants.

We therefore hold that the district court lacked Article III jurisdiction to hear this claim.

## VIII

In sum, we hold that the plaintiffs have no case or controversy with these defendants and the district court's judgment

---

[39]The dissent cites <u>Corporate Health Insurance, Inc. v. Texas Department of Insurance</u>, 215 F.3d 526 (5th Cir. 2000), for the proposition that the medical malpractice scheme alone gives the Governor and Attorney General sufficient powers of causation and redressability with regard to Act 825, notwithstanding the fact that Act 825 provides only a private cause of action.  The citation of <u>Corporate Health</u> for this proposition seems to us seriously mistaken.  The dissent ignores the following language that makes it clear that a case or controversy in that case was founded upon the authority of the Attorney General to specifically enforce the statute at issue:

> Aetna replies that it has standing because the liability provisions expose it not only to private suits but also to the regulatory reach of the Attorney General.  We agree.  <u>This is not a case in which private suits are the only means of enforcing a challenged statutory standard.</u>  The Attorney General can pursue Aetna through an action under the Texas Deceptive Trade Practices Act and the Insurance Code.  This regulatory oversight [the right of the Attorney General to sue directly] is sufficient to create the requisite imminent injury for standing.

<u>Id.</u> at 532 (emphasis added).

must be dismissed for lack of federal court jurisdiction under Article III of the Constitution. Furthermore, we have made clear in this en banc opinion that the defendants in this case enjoy Eleventh Amendment immunity from this suit and that the Ex parte Young exception to the Eleventh Amendment cannot be applied under these facts. We alternatively hold, therefore, that this suit is barred by the Eleventh Amendment.[40]

The judgment of the district court is

REVERSED, VACATED, and
REMANDED for entry of judgment of dismissal.

---

[40]It is important to keep in mind that anyone exposed to actual liability under this statute has immediate redress--that is to say, a defendant sued by a private plaintiff under Act 825 can immediately and forthwith challenge the constitutionality of the statute. The opinions that follow, although surely recognizing this fact, seem to fall prey to the fallacy that, failing the success of this particular challenge to Act 825, an allegedly unconstitutional statute will remain on the books in Louisiana in perpetuity. That is plainly not the case. Once any private plaintiff seeks to enforce her rights under the statute, Act 825, if indeed unconstitutional, will be stricken forever from the statute books of Louisiana. See La. Code Civ. Proc. Ann. art. 1871 (West 1999); Perschall v. State of Louisiana, 697 So.2d 240, 254 (La. 1997) (holding that the declaratory judgment action by plaintiff, a registered voter in the state, against the State as the party defendant was justiciable because the plaintiff's interests and "the State's duty to uphold the act" were sufficiently adverse). We note that the Eleventh Amendment is no bar to the United States Supreme Court's consideration of a case against state officers brought to it by way of state courts. See South Cent. Bell Tel. Co. v. Alabama, 526 U.S. 160, 166, 119 S.Ct. 1180 (1999).

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I concur in the judgment reversing and remanding for entry of an order of dismissal for lack of standing.  I do not concur in the treatment of *Ex parte Young*.  The majority opinion[41] reexamines the underpinnings of *Ex parte Young*[42] to support its conclusion that injunctive relief is not available here and hence the claim is barred by the Eleventh Amendment. Despite the majority's careful work, I am persuaded that this effort should not have been undertaken.

This appeal can and should be resolved by a direct and simple proposition: there is no case or controversy. Enjoining the named defendants from enforcing the statute will not redress the claimed wrongs. There is then no case or controversy under Article III of the Constitution.[43]

---

[41] I refer to the "majority" opinion because it has a clear majority in support of its treatment of standing.  The opinion's treatment of *Ex parte Young* and the Eleventh Amendment is not supported by a majority of the court.

[42] 209 U.S. 123 (1908).

[43] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568, 570–71 (1992) ("The most obvious problem in the present case is redressability. . . . The short of the matter is that redress of the only injury in fact respondents complain of requires action . . . by the individual funding agencies; and any relief . . . against the Secretary was not likely to produce that action.").

The question of standing – case or controversy – is logically anterior to the question of whether there is a defense to the claim; it goes to the court's jurisdiction and cannot be waived by the parties or conferred by agreement. The Eleventh Amendment is also jurisdictional, but it is jurisdiction in an anomalous form. It is a defense that may be invoked by the state – but need not be.

Logic is not alone in pushing the case-or-controversy inquiry to the forefront.[44] Questions of standing and redressability are familiar. The burden of a plaintiff to plead and prove standing at each stage of the proceeding is settled.[45] Stepping over this threshold inquiry to address at the outset of the suit the defense of Eleventh Amendment immunity risks confusion.[46]

---

[44] The Supreme Court recently reaffirmed that a federal court should usually address subject matter jurisdiction before personal jurisdiction in removal cases, unless personal jurisdiction is easily resolved and determining subject-matter jurisdiction is difficult. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587-88 (1999). The majority's approach is in tension with the principles of restraint underlying *Ruhrgas*. It repairs to the fundamentals of *Ex parte Young* instead of relying on a straightforward application of subject matter jurisdiction. As I explain, the Supreme Court in *Calderon v. Ashmus*, 523 U.S. 740 (1998), has addressed the sequence for standing and Eleventh Amendment issues. *See infra*.

[45] *Lujan*, 504 U.S. at 561.

[46] I recognize that some courts have addressed the application of *Ex Parte Young* without first considering standing. These cases,

In *Calderon v. Ashmus*,[47] the Supreme Court recognized this risk, insisting that standing be found before considering a state's immunity under the Eleventh Amendment. It explained that before addressing an Eleventh Amendment claim, "we *must* first address whether this action for a declaratory judgment is the sort of 'Article III' 'case or controversy' to which federal courts are limited."[48] Whether the court was expressing a rule of sequence across cases or explaining the practical compulsion in the case before it is not wholly certain. At the least, similar concerns inform my hesitation here.[49]

The question of standing in this case is easily framed. We should ask whether enjoining defendants from enforcing the statute complained of will bar its application to these plaintiffs. The

---

however, tend to involve an unusual procedural posture in which the court finds it inappropriate to review standing. *See, e.g., Summit Medical Assoc. v. Pryor*, 180 F.3d 1326, 1334-36 (11th Cir. 1999) (finding review of standing during interlocutory appeal of denial of Eleventh Amendment immunity to be unavailable under collateral order doctrine or pendent appellate jurisdiction doctrine).

[47] 523 U.S. 740 (1998).

[48] *Id.* at 745 (emphasis added).

[49] In *Calderon*, the Supreme Court overruled the Ninth Circuit, which had treated the Eleventh Amendment issue as a threshold inquiry. The Ninth Circuit addressed the Article III standing question only after it had decided the Eleventh Amendment issue. *See Ashmus v. Calderon*, 123 F.3d 1199, 1204-07 (9th Cir. 1997).

answer is no. I am persuaded that the sued defendants have no such responsibility for enforcing the statute. Whether that is so ought to be the beginning and the end of this appeal. The majority acknowledges this reality but only after a long visit with the doctrine of *Ex parte Young*.

There is another powerful argument that Eleventh Amendment immunity ought not be treated in this case. The majority reasons that the injunction exception to the Eleventh Amendment offered by *Ex parte Young* is not available because the injunction is against officials with no enforcement power; that with the wrong officials sued the action is against the State. But "official-capacity actions for prospective relief are not treated as actions against the State."[50] The Governor and Attorney General were sued in their official capacities for injunctive relief. That they are the wrong officials does not alter the relief sought. Rather, the flaw (ignoring for the moment the absence of standing) is that if the suit is against the wrong officials, no claim for injunctive relief has been stated.

---

[50] *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10, quoting *Kentucky v. Graham*, 473 U.S. at 167 n.14; *see also Ex parte Young*, 209 U.S. 123, 159–160 (1908).

## II

The majority and the dissent trade arguments over "the nexus between defendants and the statute at issue." If this is the same inquiry as standing, as it appears to be, we should be applying the doctrine of standing. Specifically, unless nexus as deployed by the majority has something to say to cases that meet the standing inquiry, it has no independent utility. Treating the requisites of standing as requirements internal to *Ex parte Young* is confusing, in part, because it does not necessarily simultaneously answer the standing question. After all, a plaintiff may have requested injunctive relief from defendants with responsibility for enforcing a law they challenge, but is unable to plead and prove individuated injury.

## III

Standing developed long after *Ex parte Young*, responding to the stress expanding public law litigation brought to the respective roles of Article III courts, the Congress, the Executive, and the states. It is more than adequate to its task of vindicating these principles of federalism and separation of powers.

Judge Benavides' opinion would find standing under the Declaratory Judgment Act.[51] This approach has three problems, in ascending order of difficulty. First, whether the district court in this case granted declaratory relief is uncertain. The court granted a preliminary injunction, questioning the constitutionality of the challenged statute in the course of finding that there was a substantial likelihood of success on the merits. The parties then agreed to convert the preliminary injunction into a permanent injunction. At best, any "declaratory relief" is only that, a conclusion implicit in the grant of injunctive relief. Perhaps this would be a sufficient declaration, but there are larger difficulties.

Second, although the Declaratory Judgment Act "brings to the present a litigable controversy, which otherwise might only be tried in the future,"[52] it does not jettison traditional standing requirements.[53] The requirements of causation and redressability are

---

[51] *See* 28 U.S.C. § 2201(a).

[52] *Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981).

[53] *See Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997) (Wisdom, J.) (noting that the "actual controversy" required under 28 U.S.C. § 2201(a) "is identical to the meaning of 'case or controversy' for the purposes of Article III").

not met here. Lack of standing disposes of this case regardless of the relief sought – injunctive or declaratory. The defendants could not threaten enforcement of the targeted state law; they lack the authority to do so. If plaintiffs attempted to sue defendants in their official capacity, acting on an assumption that although lacking enforcement power they are obligated to defend the statute in the abstract, the requisite concreteness of engagement is absent. This is so even if, contrary to my view, declaratory relief is seen as here meeting the redressability requirement of Article III.

Third, this case could not proceed even if case or controversy difficulties were somehow met – if the Governor and Attorney General were seen as proper defendants to a claim seeking declaratory relief, even though coercive relief against them could not be granted. This is because Congress did not and could not have created a generic exception to the Eleventh Amendment for declaratory relief.

IV

Some have viewed *Ex parte Young* as the culprit, the cause of these changes in the public law model of cases. More to the point, some apparently see the doctrine articulated therein as a threat to the sovereign role of states that must be tamed. I do not share

these views and fear that imposing this additional duty upon *Ex parte Young* by bringing it forward, to the front of the case or controversy inquiry, pushes the doctrine toward an amorphous, case-by-case inquiry into its availability – a destination affirmatively rejected by seven members of the United States Supreme Court.[54] I do not suggest that the majority does so here. Rather, my concern is where the path it has selected can lead.

V

Implicit in my resistance to the majority's approach is my view that *Ex parte Young* poses no threat to the Eleventh Amendment or to the fundamental tenets of federalism. To the contrary, it is a powerful implementation of federalism necessary to the Supremacy

---

[54] *See Idaho v. Coeur d' Alene Tribe*, 521 U.S. 261, 288, 291 (1997) (O'Connor, J., concurring) ("[T]he principal opinion reasons that federal courts determining whether to exercise jurisdiction over any suit against a state officer must engage in a case-specific analysis of a number of concerns . . . . This approach unnecessarily recharacterizes and narrows much of our *Young* jurisprudence."); *id.* at 297 (Souter, J., dissenting) ("The principal opinion would redefine the [*Young*] doctrine, from a rule recognizing federal jurisdiction to enjoin state officers from violating federal law to a principle of equitable discretion as much at odds with *Young*'s result as with the foundational doctrine on which *Young* rests."). The attempt in the principal opinion to frame *Young* in terms of case-by-case analysis, *id.* at 270-80 (Kennedy, J.), was joined only by the Chief Justice.

Clause, a stellar companion to *Marbury*[55] and *Martin v. Hunter's Lessee*.[56]

We should wait for the case in which plaintiffs have standing, where there is a case or controversy, before examining whether the principles of *Ex parte Young* have been unduly expanded. Since such relief can never be granted absent a case or controversy, the destination of the majority's trek today is inevitably a narrowing of the doctrine of *Ex parte Young*, rendering it either less than it has always been or an exact replication of standing doctrine. I decline passage on that voyage. I decline because I am persuaded that familiar principles of standing are better suited to answer these questions with less risk to the vital role of *Ex parte Young*.

## VI

The desire to drive a stake through the heart of the panel majority's views of *Ex parte Young* is understandable. The panel's flawed analysis offered a tempting target, enough that the en banc majority's lengthy effort to erase its memory here is not without some justification. But it pursues a ghost. The panel opinion no longer exists. It was vacated by the order granting en banc review.

---

[55] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

[56] 14 U.S. (1 Wheat.) 304 (1816).

The order granting en banc left no remains to be buried and doing so implies the need to do so, itself not the best course, to my eyes.

BENAVIDES, Circuit Judge, concurring in part and dissenting in part:

The majority, in focusing on the injunctive relief sought by the plaintiffs, has paid too little attention to the plaintiffs' request for *a declaration* that Louisiana's strict liability scheme for regulating the provision of abortions unconstitutionally burdens a woman's right to an abortion. In my view, the plaintiffs present a "controversy" that the Declaratory Judgment Act and Article III require this Court to resolve. Moreover, the Supreme Court's sovereign immunity jurisprudence does not foreclose our ability to vindicate constitutional rights when the existence of a state's self-executing statutory liability scheme places those rights in jeopardy. Indeed, I am confident this case falls "on the *Ex parte Young* side" of the Supreme Court's sovereign immunity jurisprudence – that is, as in *Young*, I believe the duty of this Court to protect constitutional rights and thereby ensure the supremacy of the Constitution over state laws outweighs the sovereign right of states to immunity from suit in federal court. For that reason, I respectfully dissent. I write separately to explain my belief that the connection requirement on which both the majority and dissent concentrate should be understood and analyzed

in terms of standing, and has little relevance to the interplay between *Ex parte Young* and the Eleventh Amendment.

## I.

I agree with the majority to the extent that it holds the plaintiffs have no standing to seek injunctive relief. Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992). When analyzing the plaintiffs' claim for injunctive relief under the unusual facts of this case, I am constrained by Supreme Court precedent to find the causation and redressability requirements lacking. However, unlike the majority of the Court, I do not believe the inquiry ends here. In addition to seeking injunctive relief, the plaintiffs in this case brought suit under the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides a mechanism for pre-enforcement review of a statute.[57] *See Steffel*

---

[57] The Act provides:
(a) In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

*v. Thompson*, 415 U.S. 452, 478, 94 S.Ct. 1209, 1225 (1974) (Rehnquist, J., concurring) ("[M]y reading of the legislative history of the Declaratory Judgment Act of 1934 suggests that its primary purpose was to enable persons to obtain a definition of their rights before an actual injury had occurred . . .).[58]

The legislative history of the Act explains that declaratory judgments "ha[ve] been especially useful in avoiding the necessity . . . of having to act at one's peril . . . or abandon one's rights because of a fear of incurring damages."  S.Rep. No. 1005, 73d Cong., 2d Sess., 2-3, 6 (1934); *see also* Hearing on H.R. 5623 before a Subcommittee of the Senate Committee on the Judiciary, 70th Cong., 1st Sess., 75-76 (1928). ("Assuming that the plaintiff has a vital interest in the enforcement of the challenged statute or ordinance, there is no reason why a declaratory judgment should not be issued, instead of compelling a violation of the statute as a condition precedent to challenging its constitutionality.")

[58] Judge Higginbotham insists that the district court in this case granted only injunctive relief, not a declaration of Act 825's unconstitutionality.  As a consequence, he maintains that independent consideration of plaintiffs' standing to seek declaratory relief is inappropriate.  In granting a preliminary injunction, the district court declared that Act 825 "has the purpose and effect of infringing and chilling the exercise of constitutionally protected rights of abortion providers and woman [sic] seeking abortions." *Okpalobi v. Foster*, 981 F.Supp. 977, 986 (E.D. La. 1998).  This declaration provided the sole basis for the district court's conclusion that the plaintiffs had demonstrated a substantial likelihood of success on the merits of their request for a permanent injunction against the statute's enforcement. *See id*.  When the district court later made its preliminary injunction permanent pursuant to an agreement between the parties, it referenced the declaration contained in its previous order.  I conclude, like the panel majority, that "[b]ecause of the express reference to the earlier order declaring the Act unconstitutional and because the only basis for the injunction articulated is the district court's decision that the Act violated the Constitution,

Although injunctive relief is not proper, the Supreme Court has repeatedly recognized "that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief, on the other." *Roe v. Wade*, 410 U.S. 113, 166, 93 S.Ct. 705, 733 (1973) (citing *Zwickler v. Koota*, 389 U.S. 241, 252-255, 88 S.Ct. 391, 397-399 (1967)). Based on my reading of Supreme Court precedent, I find the plaintiffs have standing to bring an action for declaratory relief.

It is familiar doctrine that the Declaratory Judgment Act does not itself grant federal jurisdiction. Instead, jurisdiction under the Act depends on the existence of an "actual controversy" in a constitutional sense. *Aetna Life Ins. Co.*, 300 U.S. at 239-40, 57 S.Ct. at 463-64 (1937); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). In determining whether plaintiffs have standing to bring their claim pursuant to the Declaratory Judgment Act the basic inquiry is whether there exists, under the facts alleged, "a substantial controversy, between parties having adverse

---

the order before us on appeal of necessity grants the plaintiffs' request for both declaratory and injunctive relief." *See Okpalobi v. Foster*, 190 F.3d 337, 341 (5th Cir. 1999). The Supreme Court reached the same conclusion on similar facts. *See Green v. Mansour*, 106 S.Ct. 423, 426, n.1 (1985) (finding declaration of regulation's unconstitutionality "embodied in" district court's judgment granting injunctive relief).

legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941).[59] Because I find that the plaintiffs have presented an actual controversy and have legal interests adverse to the named defendants, the Attorney General and Governor of Louisiana, I believe we have jurisdiction under Article III to consider their request for declaratory relief.

In *Steffel v. Thompson*, the Supreme Court analyzed the appropriateness of declaratory relief, specifically the existence of an actual controversy, independently from the propriety of issuing an injunction. 415 U.S. 452, 469-70, 94 S.Ct. 1209 (1974).

---

[59] While there is no bright line test for finding an "actual controversy" the Supreme Court provided guidance on the inquiry in *Aetna Life Ins. Co.*, the seminal case affirming the constitutionality of the Declaratory Judgment Act:

> A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character, from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the proceeding upon the facts alleged, the judicial function may be appropriately exercised . . .

300 U.S. at 240-41, 57 S.Ct. at 464 (citations omitted).

The plaintiff in *Steffel* sought to distribute handbills protesting United States' involvement in the Vietnam War on the sidewalk near a local shopping center. Several times the plaintiff was asked to leave and was eventually threatened with arrest for criminal trespass. *Id.* at 454-56. The plaintiff sought declaratory relief that the state trespassing statute, as applied, interfered with the exercise of his constitutional rights. *Id.* at 454-55. The Supreme Court held that the plaintiff demonstrated an actual controversy because the plaintiff suffered threats of injury that were not "imaginary or speculative" and had not been rendered moot. *Id.* at 458-60 (contrasting *Younger v. Harris*, 401 U.S. 37, 41, 91 S.Ct. 746, 749 (1971) and *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956 (1969)). Since the plaintiff faced a genuine threat of injury absent a declaration by the Court, an "actual controversy" existed and declaratory relief was appropriate.

Recently, the Supreme Court reaffirmed that "*Steffel* . . . falls within the traditional scope of declaratory judgment actions because it completely resolved a concrete controversy susceptible to conclusive judicial determination." *Calderon v. Ashmus*, 523 U.S. 740, 749, 118 S.Ct. 1694 (1998). In *Calderon*, inmates sought a declaration of whether the state of California could raise the

expedited review provisions of the Antiterrorism and Effective Death Penalty Act as a defense. *Id.* at 742. The Court distinguished *Steffel* on several grounds and found that the petitioners presented no actual controversy, and thus lacked standing under the Declaratory Judgment Act. *Id.* at 749. First, a declaration of California's status as a qualifying state would only resolve a discrete issue and not the underlying controversy - the plaintiffs' habeas claims. *Id.* at 469-70. More importantly, in contrast to *Steffel,* the statute in *Calderon* had "no coercive impact on the legal rights or obligations of either party." *Id.* In other words, the class of inmates would not have incurred any detriment by filing their habeas petitions prior to a ruling on whether California was a qualifying state. The failure to show any such injury removed the inmates' action from the traditional bounds of declaratory relief.

The present case is similar to *Steffel* in that the plaintiffs have demonstrated an injury-in-fact that will be redressed by the requested declaration. Initially, the dispute presented by the plaintiffs is neither hypothetical nor speculative, rather the dispute is founded upon the definite and concrete consequences that

will flow from the existence of Act 825.[60]  The majority does not seem to dispute, nor could it, that the plaintiffs will suffer an injury-in-fact arising from enforcement of the Act.  But beyond enforcement, Act 825, by its mere existence, coerces the plaintiffs to abandon the exercise of their legal rights lest they risk incurring substantial civil liability.  With respect to the Act's coercive effect, this case presents what this Court has recognized as the classic situation for declaratory relief: "where the plaintiff is put to the Hobson's choice of giving up an intended course of conduct which he believes he is entitled to undertake or facing possible severe civil or criminal consequences if he does undertake it."  *Texas Employers' Ins. Assoc. v. Jackson*, 862 F.2d 491, 507 n.22 (5th Cir. 1988) (en banc); *see also Nat'l. Rifle*, 132 F.3d at 279 (6th Cir. 1997) ("[P]re-enforcement review is usually granted under the Declaratory Judgment Act when a statute 'imposes costly, self-executing compliance burdens or if it chills protected [constitutional] activity.'") (quoting *Minnesota Citizens Concerned*

---

[60] This Circuit has stated: "A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional, or based upon the possibility of a factual situation that may never develop." *Rowan Companies, Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)).

*for Life v. Fed. Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997)). Further, this injury to the plaintiffs is directly traceable to the promulgation of Act 825 and will be redressed by a declaration of the statute's constitutionality. Unlike *Calderon*, a declaration in the present case completely resolves the underlying controversy – the constitutionality of the statute's chilling effect. Absent a declaration on the constitutionality of Louisiana's strict liability regime, the plaintiffs will be forced to confront the Hobson's choice that the Declaratory Judgement Act was intended to prevent.[61]

Given the plaintiffs' demonstration of an appreciable injury, the inquiry turns to whether the Governor or Attorney General has a legal interest adverse to that of the plaintiffs. I find the Attorney General has a sufficient legal interest in the constitutionality of the state's statute. This interest is recognized in both federal and Louisiana statutes, which require notification of the Attorney General in any case, civil or

---

[61] Moreover, absent pre-enforcement action by this Court, the nature of the statutory regime may inhibit *any* review of its constitutionality. Doctors fearing heightened liability will likely forgo performing abortions, thus there will be no strict liability suits brought in which the constitutionality of the regime could be tested. This lack of review exacerbates the true injury – the "chilling" of a woman's constitutional right to choose an abortion.

criminal, where the constitutionality of a state statute is at issue. LA. CODE CIV. PROC. ANN. art. 1880; 28 U.S.C. § 2403. In such cases, the Attorney General is entitled to present argument on the question of constitutionality. *Id.* Finding the Attorney General has a sufficient legal interest is also consistent with the underpinnings of the standing requirement. In this regard, the Supreme Court has inquired whether the parties "[h]ave . . . such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). I have no doubt that the Attorney General's interest in the constitutionality of the state's laws guaranteed a strong advocate and served to identify and develop for this Court, and the district court, the relevant arguments.

The concreteness of the engagement and the sufficiency of the remedy in this case are confirmed by Supreme Court jurisprudence that "has visibly relaxed . . . traditional standing principles in deciding abortion cases." *See Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986) (Higginbotham, J.). In *Doe v. Bolton*, the

Supreme Court found that physicians presented a justiciable controversy because the statute at issue was designed to operate directly against them, despite the fact that none of them had been prosecuted or even threatened with prosecution. 410 U.S. 179, 188, 93 S.Ct. 739, 745 (1973). Likewise, the physicians and clinics in this case are the direct targets of Louisiana's statute. These plaintiffs' injury is as concrete as that alleged by the plaintiffs in *Doe*. With respect to redressability, I agree that it makes little sense to enjoin the Attorney General or Governor from doing that which they have no power to do within a self-executing liability statute - enforce the statute. Yet, as noted above, enforcement of the statute is not the sole cause of injury to the plaintiffs. The mere existence of the statute causes concrete injury. The requested declaration sufficiently redresses that injury by granting the plaintiffs a substantial basis for confidence in the constitutionality of their conduct. *See Roe*, 410 U.S. at 167, 93 S.Ct. at 783 (refusing to address the propriety of injunctive relief on the basis that declaratory relief sufficiently redressed the plaintiffs' injury). Because the plaintiffs have demonstrated an appreciable injury that this Court can redress through a conclusive declaration of the statute's constitutionality, they have presented an actual controversy and

Article III obliges us to act.

II.

Having determined that the plaintiffs present a justiciable controversy, I turn to Judge Jolly's conclusion that the Eleventh Amendment renders this Court "powerless to act" on the constitutionality of a private enforcement scheme.[62]  Judge Jolly reaches this conclusion by misconstruing *Ex parte Young* as a narrow exception to the Eleventh Amendment's general directive that states are immune from suit in federal court.  In this regard, his opinion neglects our constitutional responsibility, expressed in *Young*, to redress ongoing violations of federal law and thus insure the supremacy of the Constitution.[63]  Of course, "the need to promote

---

[62]  As Judge Jolly's Eleventh Amendment conclusion has not received the votes of a majority of the sitting en banc court, it is not controlling authority for future Eleventh Amendment questions in this Circuit.  *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."), *cited in Doe v. Beaumont Ind. School Dist.*, 2001 WL 69499, *30, n. 3 (5th Cir. 2001); *see also U.S. v. Ferguson*, 211 F.3d 878, 885 (5th Cir. 2000) (noting that the opinion of an equally-divided en banc court does not disturb the prior precedent of this Circuit).

[63] *Ex parte Young*, 209 U.S. 123, 160 (1908) ("If the question of unconstitutionality, with reference, at least, to the Federal

the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Pennhurst*, 465 U.S. at 105-06. Accordingly, "[a]pplication of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts." *Idaho v. Coeur d' Alene Tribe of Idaho*, 117 S.Ct. 2028, 2034 (1997) (majority opinion). The Supreme Court's limits on *Young* thus consider the basic requirement that federal courts uphold the supremacy of the Constitution in light of the practical effect of requested relief on state sovereignty. After considering these limits, I am convinced that when a plaintiff has standing to challenge the existence of a state's self-executing, private liability scheme that currently infringes constitutional rights, federal courts have jurisdiction to redress constitutional violations.

The plaintiffs' lawsuit requires that we respect the fundamental role of *Ex parte Young* in our federal structure. In reconciling the competing constitutional commandments in the

---

Constitution, be first raised in a Federal court, that court . . . has the right to decide it . . . ."). *See also United States v. Osborne*, 22 U.S. 738, 846-51 (1828).

Eleventh and Fourteenth Amendments,[64] the *Young* court concluded that federal courts, in order to preserve an individual's rights guaranteed in the Constitution, must have jurisdiction to prevent the enforcement of unconstitutional state legislation. *Young*, 209 U.S. at 159-60.  The Court reasoned that the Eleventh Amendment could not confer immunity on a state officer to the extent that the state officer acted in an unconstitutional manner.[65]  Since 1908,

---

[64] Where the Eleventh Amendment prohibits the commencement of a suit against a state in federal court, the Fourteenth provides that no state shall deprive any person of life, liberty, or property without due process of law.  *See Young*, 209 U.S. at 149. Though *Young* avoided any pronouncement that the Fourteenth Amendment altered the scope of the Eleventh, the Supreme Court has since recognized that the Eleventh Amendment has less force when rights protected by the Fourteenth Amendment are at stake.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) ("[T]he Fourteenth Amendment, by expanding federal power at the expense of state autonomy, . . . fundamentally altered the balance of state and federal power struck by the Constitution."); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) ("[W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of section 5 of the 14th Amendment.").  That this case involves constitutional rights protected by the 14th Amendment, as opposed to non-constitutional federal rights, is thus significant.

[65] *Young*, 209 U.S. at 159 ("The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity.  It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because

the Court has reiterated time and again that the values embodied in *Ex parte Young* are fundamental to the concept of federalism embedded in our Constitution.[66]  In deciding whether the *Young* doctrine extends to cases such as that presented by the plaintiffs, our duty is to "ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law."  *Coeur d' Alene*, 117 S.Ct. at 2034 (majority opinion).

---

unconstitutional . . . The state has no power to impart to [its officials] any immunity from responsibility to the supreme authority of the United States.")

[66] *See Coeur d' Alene*, 117 S.Ct. at 2034 (majority opinion) ("We do not . . . question the continuing validity of the *Ex parte Young* doctrine."); *Seminole Tribe*, 116 S.Ct. 1114, 1131, n.14 (1996) (recognizing *Ex parte Young* as one of three significant exceptions to the Eleventh Amendment bar on suits in federal court); *Green*, 106 S.Ct. at 426 ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law."); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 105-06 (1984) ("[T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'") (citations omitted); *Quern v. Jordan*, 99 S.Ct. 1139, 1143 (1979); *Scheur v. Rhodes*, 94 S.Ct. 1683, 1687 (1974); *Georgia R. & Banking Co. v. Redwine*, 72 S.Ct. 321, 324 (1952).  *See also* Judge Higginbotham's concurring opinion (*Young* "is a powerful implementation of federalism necessary to the Supremacy Clause, a stellar companion to *Marbury* and *Martin v. Hunter's Lessee*.").

The plaintiffs' suit implicates the precise concerns regarding the supremacy of constitutional rights that precipitated the *Young* line of cases. To be sure, the case presented by the plaintiffs does not fall into the traditional *Young* paradigm - no Louisiana state officer will enforce Act 825's civil penalty against doctors that perform abortions, likewise no doctor will be prosecuted by the state for performing an abortion. Nevertheless, the Act's unique authorization of private strict liability lawsuits against providers of abortions burdens the right to an abortion to the same extent as legislation granting an Attorney General the power to prosecute or fine individuals for performing abortions. That the private sector, not the state, enforces penalties for performing abortions does not alter the fundamental effect of Louisiana's scheme - doctors will refrain from performing abortions because of the financial consequences involved and women in Louisiana will face a significant burden in exercising their constitutional right to receive an abortion. *See Jackson*, 862 F.2d at 507 (recognizing that both civil and criminal penalties could chill constitutional conduct). Likewise, the structural anomaly of Act 825 should not render Louisiana any more immune from challenge in federal court. This case presents a context in which *Ex parte Young* must operate

to afford meaningful protection for rights guaranteed by the Constitution.

Though Judge Jolly neglects to consider fully the aspects of *Ex parte Young* supporting federal jurisdiction to hear cases involving private schemes, very real concerns about protecting the sovereign immunity of the states animate his opinion. That opinion, however, ignores both practical reality and recent Supreme Court jurisprudence regarding the role of officials sued in *Ex parte Young* actions. Judge Jolly seems to understand the connection requirement that serves as the foundation for his Eleventh Amendment analysis as a mechanism for ensuring that the state officer, rather than the state itself, is the object of the litigation. In this sense, the opinion's connection requirement assumes that the fiction of *Ex parte Young* has some real meaning in the Eleventh Amendment context - that it is the individual officer, not the state itself that is the real party in interest. This is simply not the case. For many years, the Supreme Court has shaped the scope of the *Ex parte Young* exception as if the state officer were the state. *See, e.g., Coeur d' Alene*, 117 S.Ct. at 2034 (majority opinion) ("Th[e] commonsense observation of the State's real interest when its officers are named as individuals has not

escaped notice or comment from this Court, either before or after *Young*.") (citations omitted). Were the state not the real party in interest in suits brought under *Ex parte Young*, the Supreme Court could never find the necessary state action to support a violation of the 14th Amendment. *See Home Telephone. & Telegraph. Co. v. City of Los Angeles*, 227 U.S. 278, 283-84 (1913) (recognizing a distinction between official action under the Fourteenth Amendment and official action for purposes of the Eleventh Amendment). Similarly, the provision of the Federal Rules of Civil Procedure providing for the automatic substitution of the name of one state official for the name of his predecessor would make no sense in litigation under *Ex parte Young*. *See* FED R. CIV. P. 25(d) (1999). Indeed, Judge Jolly's own characterization of *Ex parte Young* as an *exception* to the Eleventh Amendment evinces an understanding that *Young* allows *the state* to be sued, albeit through its officers, when constitutional questions are raised and prospective relief is sought.

In developing the connection requirement as a component of the Eleventh Amendment's protection of state sovereignty, Judge Jolly's opinion attempts to spin the *Young* fiction into reality. Yet, the opinion's connection requirement turns reality on its head,

granting a state broader immunity from suit in federal court when its officers are not directly involved in the enforcement of an unconstitutional act than when the officers are directly involved. That position is simply untenable. Although language in *Young* may support the connection requirement defined in Judge Jolly's opinion, the Supreme Court's modern standing doctrine has subsumed the connection inquiry. The standing requirements of injury-in-fact, causation, and redressability parallel the majority's requirement that state officers have "some connection with the enforcement of the act" alleged to be unconstitutional or be "specially charged with the duty to enforce the statute" and be threatening to exercise that duty.[67] Perhaps for this reason, Judge Jolly's opinion does not cite a single modern Supreme Court case that relies on its connection requirement to support dismissal of an *Ex parte Young* action on Eleventh Amendment grounds. By analyzing the connection requirement in terms of standing, the Supreme Court has retained the limit, but avoided the conundrum of increasing the scope of Eleventh Amendment protection as the role

---

[67] The majority's explanation of "the connection" simply reiterates the causation and redressability components of standing, while the majority's requirement that the officer be threatening to exercise the duty is encompassed by the current injury-in-fact analysis under standing.

of the state in an allegedly unconstitutional statute decreases. This Court must analyze the proper scope of *Young* in light of reality rather than fiction. Reality requires examination of the limits that the Supreme Court has consistently placed on *Young* and determining whether those limits apply in the present context.[68]

Unlike Judge Jolly's connection requirement, the Supreme Court's limits on *Ex parte Young* have focused on the extent to which federal litigation will interfere with a state's sovereign rights. The Supreme Court's principal limit has been on the nature of the relief sought: *Ex parte Young* cannot be used to expose states to retroactive monetary damages. *Edelman v. Jordan*, 94 S.Ct. 1347, 1362 (1974); *see also Hutto v. Finney*, 437 U.S. 678 (1978) (allowing *Ex parte Young* plaintiffs to receive monetary relief that is clearly ancillary to non-monetary prospective relief). This limit reflects both historical and practical considerations. The "shock of surprise" following the Supreme

---

[68] While it might be sensible to do away with the *Young* fiction and recognize that the Fourteenth Amendment and our federal structure require that states be sued in limited circumstances, that would be beyond the power of this intermediate court. That is not, however, what this opinion purports to do. In this sense, Judge Jolly's caricature of my opinion as a gross departure from existing case law and the Constitution fails to confront the Supreme Court's modern jurisprudence on the interplay between *Ex parte Young* and the Eleventh Amendment in any meaningful way.

Court's decision in *Chisholm* that led to the passage of the Eleventh Amendment was triggered by the fear that individuals would be able to use the federal courts to collect large debts from the states. *See Principality of Monaco v. Mississippi*, 54 S.Ct. 745, 749 (1934). Thus, the prohibition on seeking monetary relief against a state in federal court addresses the historical concerns that existed at the time the Constitution, and subsequently the Eleventh Amendment, were ratified. From a practical standpoint, this limit safeguards one of the most important elements of sovereignty - the ability to independently manage and distribute public revenues. At the same time, the Court's allowance of prospective injunctive or declaratory relief provides a mechanism for safeguarding the ultimate supremacy of our federal constitution and the federal system which it created. *See Coeur d' Alene* at 2040; *id*. at 2046 (O'Connor, J., concurring) ("When a plaintiff seeks prospective relief to end an ongoing violation of federal rights, ordinarily the Eleventh Amendment poses no bar."); *Green*, 106 S.Ct. at 426 ("[T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause."); *Milliken v. Bradley*, 97 S.Ct. 2749, 2761-62 (1977).

The Supreme Court has applied its limits on the scope of *Young* pragmatically, guided by the substantive effect of the remedy sought rather than the form alone. In this regard, even injunctive or declaratory relief that substantially interferes with a state's sovereignty may be barred by the Eleventh Amendment when constitutional concerns are not at issue. Thus, in *Coeur d' Alene,* a majority of the Supreme Court held that the plaintiff Indian tribe could not receive injunctive or declaratory relief that would in effect function like a quiet title action against the state of Idaho. *See Coeur d' Alene*, 117 S.Ct. 2044 (O'Connor, J., concurring). Though the majority of the Court clearly rejected the case-by-case balancing approach proposed by Justice Kennedy, the Court also recognized that the *Young* - Eleventh Amendment inquiry had to transcend form and inquire into substance. Judge Jolly's approach is flawed in that it limits *Ex parte Young* haphazardly without any consideration of the constitutional rights at stake or how the relief sought interferes with states' rights.

In the present case, the plaintiffs challenge the constitutionality of state legislation and thus invoke *Young*'s concern regarding the power of the federal courts to vindicate constitutional rights. Moreover, the form of relief that they seek

- a declaration of unconstitutionality - is the least intrusive available.[69]  In *Steffel v. Thompson*, the Supreme Court recognized the unique nature of and "different considerations" involved with granting declaratory relief.  *Steffel*, 415 U.S. at 469-70.  The Court has disregarded the distinction between declaratory and injunctive relief only when "principles of federalism militated altogether against federal intervention in a class of adjudications."  *Id.* at 472.  For example, in *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764 (1971), the Court concluded the issuance of a declaration of a statute's constitutionality during a pending state proceeding would offend a principle notion of federalism - "that state courts have the solemn responsibility, equally with the federal courts 'to guard, enforce, and protect every right granted or secured by the constitution of the United States.'" *Steffel*, 415 U.S. at 460-461 (quoting *Robb v. Connelley*, 111 U.S. 624, , 637, 4 S.Ct. 544 (1884)).  However, "[w]hen no state proceeding is pending and thus considerations of equity, comity, and federalism have

_____

[69] If the federal court declares the contested statute unconstitutional, the state legislature may amend or repeal the statute or the state courts may be persuaded by the decision of the federal court.  In any event, "[a]ll these possible avenues of relief would be reached voluntarily by the States and would be completely consistent with the concepts of federalism . . ." *Id.* at 484 (Rehnquist, J., concurring).

little vitality, the propriety of granting federal declaratory relief may properly be considered independently of a request for injunctive relief." *Id.* at 462. Far from precluding our Court from considering the merits of a plaintiff's request for declaratory relief, principles of federalism compel our Court to address alleged constitutional violations when, as in this case, a plaintiff successfully establishes the existence of a continuing controversy.[70]

### III.

The avenue to the federal courts opened by *Ex parte Young* should be available when the plaintiff (1) can establish an actual controversy involving alleged constitutional violations; and (2) seeks declaratory relief that does not in substance interfere with

---

[70] Judge Higginbotham contends that I propose a "generic exception to the Eleventh Amendment for declaratory relief." This is simply not the case. As previously noted, the declaratory form of relief sought by the plaintiffs is relevant to the Eleventh Amendment inquiry only in so far as the Supreme Court has consistently considered the intrusiveness of the relief sought when defining the scope of *Ex parte Young*. That a declaration on these facts constitutes the least intrusive form of relief available does not mean that other forms of relief would necessarily violate the Eleventh Amendment. Yet, I need not consider whether the Eleventh Amendment would impede our ability to issue forms of relief that the plaintiffs do not have standing to seek. That said, my approach to determining the Eleventh Amendment limits on *Ex parte Young* would apply with equal force in cases involving injunctions or other forms of relief.

sovereign rights in ways specifically prohibited by the Supreme Court, such as effectively awarding monetary damages against a state or preempting ongoing state proceedings. This approach neither casts aside the *Young* fiction, nor crafts a new "declaratory judgment exception" to the Eleventh Amendment. Rather, my approach reflects a principled and necessary application of the *Ex parte Young* doctrine. Though I agree with the majority's conclusion that the injunction against the named defendants was improper, I find that the plaintiffs have presented an actual controversy that is ripe for declaratory relief. Moreover, in my view, the Eleventh Amendment does not impede the plaintiffs' ability to pursue that relief in a federal forum. Accordingly, I concur with the majority's opinion that the plaintiffs' injunction should be dismissed, but dissent to the extent that the majority opinion undermines the district court's power to issue the underlying declaration on Act 825's constitutionality.

ROBERT M. PARKER, Circuit Judge, dissenting:

I respectfully dissent.  Judge Jolly's attempt to excessively narrow *Ex parte Young*'s scope garners only a plurality of this court, and therefore, to use his language, it "is not binding authority to any."  I write to note his flawed treatment of *Young* and to present the traditional jurisprudential view of its scope, and to respond to the opinion to the extent it represents the court's decision to dismiss this action against Appellants for lack of a "Case or Controversy."

## I.

I start by observing that the court's decision does not entirely dispose of this action because the State remains as a named defendant.  Appellees initially sued the Governor and the Treasurer in the district court.  The Governor and Treasurer moved to dismiss per FED. R. CIV. P. 12(b)(6), alleging that the Treasurer should be dismissed for failure to state a claim.  The parties then stipulated to substitute the State for the Treasurer as a named defendant, and Appellants withdrew the motion to dismiss as moot. Appellants, including the State, then filed an answer against Appellees' claims.  The State proceeded to litigate this action on the merits, never questioning the existence of jurisdiction until the panel dissent, *sua sponte*, raised the Eleventh Amendment and

92

standing arguments.  Therefore, the district court's injunction is unaffected with respect to the State.

II.

A.

Act 825 is yet another attempt by the State to violate federal constitutional rights as construed by federal courts.  As Judge Higginbotham observed:

> This appeal is the latest episode in a long effort by Louisiana to exercise its police power over a practice to which the courts have given considerable protection. Indeed, the state seeks to "regulate abortion to the extent permitted by the decisions of the United States Supreme Court." La. Rev. Stat. Ann. § 40:1299.35.0 (West Supp 1986).  Although one would not think that there is anything inherently suspect about a state's undertaking to regulate in the abortion area, Louisiana has repeatedly encountered constitutional objections to portions of its regulatory schemes.

*Margaret S. v. Edwards*, 794 F.2d 994, 996 (5th Cir. 1986) (footnote omitted); *see* 22C LA. REV. STAT. ANN. 40:1299.35.0 (West 1992) (expressing "legislative intent" to defy Supreme Court authority on abortion).  After a long history[71] of restricting a woman's right

---

[71]  Five years after *Roe v. Wade*, the State enacted an abortion regulation statute, but a district court struck down several provisions as unconstitutional. *Margaret S. v. Edwards*, 488 F. Supp. 181 (E.D. La. 1980).  The State promptly passed another statute that required, *inter alia*, costly and unnecessary ultrasound testing prior to abortion, hospitalization for post-first-trimester abortions, untenable presumptions of fetus viability, second opinions regarding necessity of an abortion to preserve a mother's health, and parental consent without adequate judicial bypass provisions.  A district court declared most of

to choose abortion, the State, by enacting Act 825, has now changed tactics and is attempting to ban abortion altogether by creating a private cause of action imposing unlimited liability on anyone performing an abortion. As the majority admits, Act 825 exposes anyone to "unlimited tort liability for any damage caused by the abortion procedure to both mother and 'unborn child.'" *Supra* at __. Liability is imposed for any "injury" to an "unborn child," which means that liability can be imposed for the mere act of performing an abortion itself. Moreover, the person performing the abortion cannot avoid liability by obtaining informed consent from the patient. Informed consent "does not negate [the] cause of action, but rather reduces the recovery of damages." § 9:2800.12C(1). This is in stark contrast to the existing civil liability provision of the State's informed-consent law, which provides a complete defense to malpractice claims if the physician complies with the law's extensive requirements. 22C LA. REV. STAT. ANN. § 40:1299.35.6H (West 2000). Further, Act 825 provides no defense to malpractice suits for abortions performed in case of medical necessity or to protect the health of the patient. Finally, Act 825's mischief is not limited to abortion providers.

---

these provisions unconstitutional, *Margaret S. v. Treen*, 597 F. Supp. 636 (E.D. La. 1984), and we affirmed that declaration. *See Margaret S.*, 794 F.2d at 999.

It covers a broad range of women's health care providers, including physicians treating serious medical conditions such as infection or trauma, the treatment for which may include medically necessary abortion. It also includes manufacturers of contraceptives and the physicians and pharmacists who prescribe them. Thus, Act 825 imposes strict liability to anyone performing an abortion.

Such provisions confirm that Act 825 constitutes an undue burden on a woman's right to choose an abortion because it has the purpose and effect of placing a substantial obstacle hindering the exercise of that right. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 877 (1992) (joint opinion). By exposing any person performing an abortion to strict liability regardless of the person's compliance with existing law, Act 825 is not designed to help a woman's choice, but to eliminate that choice by effectively shutting down abortion providers. *See id.; Hope Clinic v. Ryan*, 195 F.3d 857, 876, 881 (Posner, C.J., dissenting). The fact that compliance with informed consent regulations does not negate liability proves that Act 825 is not designed to help a woman's choice. Moreover, because it is undisputed that Act 825 will force Appellees, who provide substantially all of the abortion services within Louisiana, to cease operations, Act 825 places a substantial obstacle on the right to choose an abortion. *Casey*,

505 U.S. at 877; *Planned Parenthood v. Miller*, 63 F.3d 1452, 1465 (8th Cir. 1995).

In addition, it is clear that the State has enacted Act 825 in an attempt to circumvent federal court decisions upholding the right to choose an abortion. The State's abortion code is codified in Title 40 of its Revised Statutes governing "Public Health and Safety," and contains numerous regulations the violation of which gives rise to criminal and civil penalties. The State has buried Act 825 in its "Civil Code Ancillaries" section of its Revised Statutes, providing only civil remedies to private parties. By privatizing the enforcement of unlimited monetary damages, which is undoubtedly a state-sanctioned penalty, the State is attempting to avoid defending a patently unconstitutional law while simultaneously effecting a coercive impact so drastic that abortion providers have no choice but to cease operations. This purpose is illegitimate not only because Act 825 unduly burdens a constitutionally protected right, but also because it seeks to evade judicial review. However, Act 825 is not entirely novel in form; federal courts have consistently declared similar statutes to be unconstitutional.

### B.

Since *Roe v. Wade*, 410 U.S. 113 (1973), and *Doe v. Bolton*, 410 U.S. 179 (1973), individual women, abortion providers, and clinics

have invoked the federal judicial power to challenge abortion regulations by bringing actions pursuant to *Ex parte Young*, 209 U.S. 123 (1908), for declaratory and injunctive relief against state officials.  Notwithstanding the fact that the *Roe* plaintiff's pregnancy had terminated and that no prosecution was threatened against her, the Supreme Court permitted her to challenge Texas's criminal abortion law by suing a district attorney.  *Roe*, 410 U.S. at 124-25.  Similarly, the Court extended standing to abortion providers in *Doe* notwithstanding the fact that none were prosecuted or threatened with prosecution under Georgia's abortion law.  *Doe*, 410 U.S. at 188.  While earlier abortion regulations imposed criminal liability for their violation, the inclusion of civil liability did not prevent aggrieved plaintiffs from challenging such regulations even though named defendants had no power to enforce such actions.  *E.g.*, *Casey*, 505 U.S. at 888; *Colautti v. Franklin*, 439 U.S. 379, 383-84 (1979); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S.52,  83-84 (1976).

In *Casey*, the Supreme Court retained *Roe*'s essential holding and established the undue burden test for reviewing the constitutionality of state interference with a woman's right to choose an abortion.  505 U.S. at 875 (joint opinion). Significantly, the plaintiffs in *Casey* consisted of abortion providers and clinics suing, on behalf of their patients, the

Pennsylvania governor and attorney general, just as in this case. The plaintiffs brought suit before the effective dates of the challenged laws, just as in this case. The Court declared, *inter alia*, Pennsylvania's spousal consent statute, which made a physician performing an abortion on a married woman without her spouse's consent liable to the spouse for civil damages, unconstitutional. *Id.* at 887-98. The Court reasoned that such provision would impose a substantial obstacle to the woman's ability to obtain an abortion and would deter most women from obtaining an abortion as if the state had completely outlawed abortions. *Id.* at 893-94. Such reasoning forms the basis of Appellees' claims in this case.

In recent years, several circuits, including this court, have reviewed challenges to state abortion statutes under the *Roe* and *Casey* models and reached the merits of such challenges even when they included civil liability provisions not enforced by the state officers. *See, e.g.*, *Causeway Med. Suite v. Foster*, 221 F.3d 811 (5th Cir. 2000) (Jolly, J.), *aff'g*, *Causeway Med. Suite v. Foster*, 43 F. Supp. 2d 604 (E.D. La. 1999) (enjoining Louisiana governor and attorney general from enforcing the State's partial-birth abortion statute, 22C LA. REV. STAT. ANN. § 40:1299.35.3, *recodified in* § 40:1299.35.16 (West Supp. 2000), which, *inter alia*, provided a civil cause of action for damages against an abortion provider

who violates the statute); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997) (declaring unconstitutional Ohio abortion statute's provision of strict civil liability for compensatory, punitive, and exemplary damages as well as costs and attorney's fees against the physician for certain late-term abortions); *Miller*, 63 F.3d at 1456 n.5. & 1467 (striking down provision of South Dakota abortion statute creating a civil cause of action for punitive and treble actual damages to a minor and parent, and declaring that "[t]he potential civil liability for even good-faith, reasonable mistakes is more than enough to chill the willingness of physicians to perform abortions in South Dakota."). *But see Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999) (holding that the Alabama governor, attorney general, and district attorneys were not proper defendants for the plaintiffs' challenge to the civil liability provision of Alabama's abortion statute); *Hope Clinic v. Ryan*, 195 F.3d 857 (7th Cir. 1999) (en banc) (relying on *Summit Medical* and dismissing the plaintiffs' challenge to Illinois and Wisconsin partial-birth-abortion statutes providing, *inter alia*, a civil cause of action because defendants--attorneys general and prosecutors--did not enforce such provisions), *vacated on other grounds*, 147 S. Ct. 1001 (2000).

The important lesson from the above decisions is that they involved actions brought pursuant to *Young* to enjoin state governors, attorneys general, and prosecutors from enforcing allegedly unconstitutional statutes before they became effective. While the challenged statutes contained both criminal and civil liability provisions, courts nonetheless reached the merits of the plaintiffs' challenge to determine whether the statutes, including the civil liability provisions, imposed an undue burden on a woman's right to choose an abortion. Only the Seventh and Eleventh Circuits dismissed the plaintiffs' challenge to the civil liability provisions for lack of jurisdiction.

Under the relevant authority discussed above, we are not powerless to act in reviewing the judgment of the district court. Act 825 is similar to the statutes that were challenged pursuant to *Young* in the above decisions, but is also different because it only imposes civil liability. However, that difference should not conceal the fact that the State, by enacting Act 825, is attempting to *regulate* abortion providers by exposing them to unlimited strict liability for the mere act of performing an abortion. Such exposure is designed to eradicate all abortions by effectively shutting down Appellants' operations, something the State cannot do directly or indirectly. When this staggering effect is considered with the State's patently illegitimate purpose of unduly burdening

the right to abortion while evading judicial review by enacting Act 825, the court's decision to dismiss this action excessively narrows the scope of *Young*'s principles and undermines the supremacy of federal rights.

III.

A.

The plurality's most egregious error lies in its flawed and unnecessary revisionist interpretation of *Smyth v. Ames*, 169 U.S. 466 (1898), *Fitts v. McGhee*, 172 U.S. 516 (1899), and *Young*.[72] The plurality's interpretation is simply unsupported by *Young*'s express language and holding. In *Young*, the Supreme Court stated that the

---

[72] The plurality states that the parties "vigorously pressed" the jurisdictional arguments before this court by referring to *Patsy v. Board of Regents*, 457 U.S. 496, 515 n.19 (1982). In *Patsy*, the Supreme Court declined to rule on the Eleventh Amendment issue because it was only mentioned in passing by the state before four courts, which had not addressed it. The Supreme Court chose to rule upon the merits of the exhaustion of remedies issue, which was initially presented in a Rule 12(b)(6) motion to dismiss, because it was raised and decided by the district court and this court (both panel and en banc) and "vigorously pressed" before the Court. It light of *Patsy*'s procedural history, and in light of the fact that in this action we raised, and the parties briefed, the Eleventh Amendment issue on the court's own initiative after the panel decision, it is improper to suggest that the parties pursued this issue with the same vigor as the parties in *Patsy*. *See Coolbaugh v. Louisiana*, 136 F.3d 430, 442 n.5 (5th Cir. 1998) (Smith, J., dissenting) ("Raising [the Eleventh Amendment issue] *sua sponte* is problematic . . . in light of *Patsy*.").

suit against the Nebraska attorney general in *Smyth* was not against the state because "[t]here was *no special provision* in the statute as to rates, making it the duty of the attorney general to enforce it, but, under his *general powers*, he had authority to ask for a mandamus to enforce such or *any other law*." *Young*, 209 U.S. at 154 (emphasis added). After citing decisions supporting this holding, the Court stated:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with *some duty* in regard to the enforcement of the *laws of the state*, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

*Id.* at 155-56 (emphasis added). Then, the Court, as the plurality correctly notes, *distinguished Fitts* from *Smyth* by noting that in *Fitts*

> As no state officer who was made a party bore any *close official connection* with the act fixing the tolls, the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way, and there is no principle upon which it could be done. A state superintendent of schools might as well have been made a party.

*Id.* at 156 (emphasis added). The Court restated *Fitts*' holding as:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have *some connection with the enforcement* of the act, or else

> it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

*Id.* at 157.

Most importantly, the plurality errs by not recognizing that *Young* limited *Fitts'* "close official connection" requirement by stating that

> It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed . . . , but that may possibly make the duty more clear. The fact that the state officer, *by virtue of his office*, has *some connection with the enforcement of the act*, is the important and material fact, and whether it arises out of the *general law*, or is specially created by the act itself, is not material so long as it exists.

*Id.* (emphasis added). In contrasting *Smyth* and *Fitts*, the Court in *Young* stated that *Smyth* involved "state officers *specially charged with the execution of a state enactment*," and that such "special charge" was "sufficiently apparent when such duty exists under the *general authority of some law*, even though such authority is not to be found in the particular act. It might exist by reason of the *general duties* of the officer to enforce it as a law of the state." *Id.* at 158 (emphasis added). The Court concluded that the officers in *Fitts* "had *no duty at all* with regard to the act." *Id.* (emphasis added). The significance of all this is that in *Young*, the Court departed from *Fitts'* close connection or special relation

requirement by inferring "some connection" to the challenged act from the attorney general's general duty to enforce Minnesota's laws and by virtue of his office.  *Id.* at 160-62.  In light of *Young*'s interpretation of *Fitts*, it is flatly wrong to assert *Young* and *Fitts* are consistent.  *See City of Altus v. Carr*, 255 F. Supp. 828 (N.D. Tex.) (three-judge court), *aff'd*, 385 U.S. 35 (1966) (mem.); *cf.* CLYDE E. JACOBS, THE ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY 130-42 (1972) (noting the inconsistency between *Fitts* and *Young*).

Moreover, Justice Harlan, who wrote *Smyth* and *Fitts*, dissented in *Young* by stating that *Fitts* "is not overruled, but is, I fear, frittered away or put out of sight by [the *Young* majority's] unwarranted distinctions."  *Id.* at 193 (Harlan, J., dissenting). Justice Harlan disagreed with the *Young* majority's statement that *In re Ayers*, 123 U.S. 443 (1887), was not controlling.  *Young*, 209 U.S. at 189-90.  *Ayers* involved a Virginia statute ordering state officials to sue to recover taxes from taxpayers who had used interest coupons on state bonds to pay their taxes.  The Court in *Ayers* held that the taxpayers could not bring suit against the officials to enjoin them from enforcing the statute because such suit would be against the state.  Justice Harlan's dissent in *Young* argued that the barred suits in *Ayers* were identical to the ones in *Young* because they both involved suits against officers with no

special duty to see to the enforcement of the statutes in question, and therefore such suits were effectively against the state. *Id.* at 203. Furthermore, Justice Harlan asserted that *Fitts*, which applied the principles of *Ayers*, was "[m]ore directly on point" in *Young.* *Id.* at 190. In addition, he noted that *Smyth*, which was "much relied" on by the majority, was distinguishable from *Young*'s facts because in *Smyth* Nebraska waived immunity from suit by virtue of a cause of action expressly granted to the railroads by the statute in question. *Id.* at 193-94. Justice Harlan feared that *Fitts* was "frittered away" because the majority's reliance on *Smyth* to support jurisdiction was erroneous in light of *Fitts*' reaffirmation and application of *Ayers*. *Cf.* RICHARD H. FALLON ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1065-66 (4th ed. 1996) (stating that *Young* undermined *Ayers*). Significantly, he stated: "The statutes in question did not impose upon the attorney general of Minnesota any special duty to see to their enforcement. In bringing the mandamus suit he acted under the *general authority inhering in him as the chief law officer of his state*." *Id.* at 197 (emphasis added).

The plurality erroneously interprets *Smyth*, *Fitts*, and *Young* as a consistent doctrine–a "triad"–emphasizing "strict" requirements that the officers sued have "some connection with the

enforcement of the act" in question or be "specially charged with the duty to enforce the statute." However, there is no "triad," and the *Young* fiction is not recognized by any court as the "*Smyth*-and-*Young*-as-minimized-by-*Fitts*" exception to the Eleventh Amendment bar. There is no authority supporting *Smyth*, *Young*, and *Fitts* as a consistent line of decisions, and that contention is belied by Justice Harlan's inability to distinguish the statute in *Fitts* from the statute in *Young*. *Young*, 209 U.S. at 193 (Harlan, J.) ("I am unable to distinguish [*Fitts*], in principle, from the one now before us."). Further, the statutes in *Young* and *Smyth* were not in "sharp contrast" with the statute in *Fitts* because, according to Justice Harlan, there was no difference between the statutes in *Young* and *Fitts*, whereas the statute in *Smyth* expressly granted a cause of action to the railroads against the state. *Id.* at 193-94. More importantly, *Young* limits *Fitts* by finding the necessary "connection" between the officer and the act by "virtue of his office" whether it arises out of the general law or is specially created.

The plurality incredibly asserts that *Young* "has spawned numerous cases upholding, explaining, and recognizing its fundamental principle" to suggest that its interpretation is so widely accepted as to be beyond doubt. While I agree that *Young*

has spawned numerous cases, not all of them have upheld or consistently applied its fundamental principle. The plurality's suggestion that *Young* has been uniformly applied is an embellishment that defies even *Young*'s illogic. Indeed, the plurality only cites decisions to support its assertion but conspicuously omits contrary authority as if none exists. *See, e.g.*, *City of Altus*, 255 F. Supp. at 835. Moreover, the decisions the plurality cites are hardly a representative sample of consistent applications of *Young*, and most are inapposite to this action because they do not address actions pursuant to *Young* challenging abortion regulations.

In addition, the plurality's statement that the "requirement that there be some actual or threatened enforcement action before *Young* applies has been repeatedly applied by the federal courts" is inaccurate. Numerous Supreme Court cases have relaxed the "threatened enforcement" requirement of *Young* in the abortion context. *E.g.*, *Casey*, 505 U.S. at 845 (reviewing pre-enforcement challenge to Pennsylvania's abortion law); *Doe*, 410 U.S. at 745 (permitting pre-enforcement challenge to Georgia abortion law even before the defendants threatened prosecution); *Roe*, 410 U.S. at 712-13 (permitting pre-enforcement challenge to Texas abortion law despite the fact that the plaintiff was not pregnant). Other

decisions directly contradict the plurality's statement. *See, e.g.*, *Papasan v. Allain*, 487 U.S. 265, 282 n.14 (1986) (holding that the Mississippi Governor and Secretary of State were proper defendants because of their "general supervision" over local officials administration of land set-asides for educational purposes); *Voinovich*, 130 F.3d at 210 ("Here, the prosecutors *could* charge plaintiff.") (emphasis added); *Los Angeles Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992) (holding that *Young* applied even though there was no enforcement by the defendant officials of the challenged statute governing judicial appointments by the defendants because "[The statute at issue] is simply not the type of statute that gives rise to enforcement proceedings."); *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988) ("Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity."). In light of these decisions, to state that federal courts have repeatedly required the institution of some actual or threatened enforcement action before hearing officer suits mischaracterizes existing law.

B.

The plurality compounds its error in reinterpreting *Young* by formulating a "some connection" test that is so amorphous that even the plurality cannot precisely articulate what it measures. The

test is initially stated as "whether the *Young* fiction requires that the defendant state official have some enforcement powers with respect to the particular statute at issue, or whether the official need have *no such enforcement powers* and only need be charged with the general authority and responsibility to see that all of the laws of the state be faithfully executed." *Supra* at __ (emphasis added). Then, this "test" is redrafted as gauging "(1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute." *Id.* at ____ (emphasis added). However, the "test" undergoes a further revision when the plurality modifies the "demonstrated willingness" prong to include "the ability to act." *Id.* at ___.

The plurality thus transforms its reinterpretation of *Young* to create an erroneous test that undermines *Young*'s principle of permitting pre-enforcement officer suits to "vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Young*, 209 U.S. at 160)). Without explanation, *Young*'s requirement that there be "some connection with the enforcement of the act" has been modified to something beyond "general authority and responsibility," and then distilled to "statutory or constitutional powers." However,

this reformulation cannot be reconciled with *Young*'s express language that the connection or duty of an officer may arise, "by virtue of his office," out of the "general law, *or* is specially created by the act itself." *Young*, 209 U.S. at 157 (emphasis added); *Papasan*, 478 U.S. at 283 n.14; *Luckey*, 860 F.2d at 1016.

IV.

Nonetheless, even under this "test" Appellants have "some connection to the enforcement" of Act 825. A distinct nexus exists because Act 825 strips Appellees and other abortion providers of statutory limitations on medical malpractice liability they currently enjoy. § 9:2800.12(C)(2). The Governor and Attorney General supervise and control the implementation of the statutory limitations of liability, codified in Title 40 of the State's Revised Statutes. By exempting all claims brought pursuant to Act 825 from Title 40 coverage, Act 825 requires the Governor and Attorney General, and the entities and administrators they supervise and control, to enforce this exemption by disallowing any abortion provider's claim to liability coverage whenever they are sued under Act 825.

Under Louisiana's medical malpractice regime, total liability is capped at $500,000. 22C LA. REV. STAT. ANN. § 40:1299.42.B. However, any private doctor is liable only up to $100,000–any

-110-

additional liability up to $500,000 is to be paid from a Patient's Compensation Fund ("PCF").  § 40:1299.42.B; *see also Kelty v. Brumfield*, 633 So.2d 1210 (La. 1994) (per curiam).  The PCF is administered by the Patient's Compensation Fund Oversight Board ("PCFOB"), a board in the office of the Governor with members appointed by the Governor.  § 40:1299.44.D.  The PCFOB may contest the quantum of damages, but not its liability.  *See Kelty*, 633 So.2d at 1216.

The Office of Risk Management ("ORM") is an office within the Governor's Division of Administration and headed by the commissioner of administration, and is thus subject to the Governor's direct control and supervision.  §§ 39:3-5; 39:1528. The ORM appoints legal counsel for the PCF and establishes minimum qualification standards for such counsel.  § 40:1299.41.J.  Any liability incurred by the state is paid from the Self-Insurance Fund.  § 39:1533.  It is the duty of the Attorney General to appoint legal counsel to the Self-Insurance Fund, and the Attorney General must approve all settlements made by the Self-Insurance Fund over $25,000.  §§ 39:1533.B; 39:1535.B(6).[73]

---

[73]  In addition, the constitutionality of a statute may not be attacked in a declaratory judgment action unless the Attorney General is served with a copy of the proceeding, and the Attorney General is entitled to be heard and, at his discretion, to represent or supervise the representation of the interests of the state in the proceeding.  *See Vallo v. Gayle Oil Co., Inc.*, 646

Under Title 40's medical malpractice regime, all malpractice claims against state and private health care providers must be reviewed by a medical review panel before the claimant can file suit in court. §§ 40:1299.39.1; 40:1299.47. The state medical review panels are administered by the commissioner of administration, who is appointed and supervised by the Governor and serves at the Governor's pleasure. §§ 40:1299.1.A(1); 39:1. The private medical review panels are administered by the PCFOB. §§ 40:1299.44D; 40:1299:47. The medical review panels are required to render expert opinions on each claim that are admissible in evidence in any subsequent court action, and members of the panel may be called as expert witnesses in the case. §§ 40:1299.39.1G, H; 40:1299.47.G, H; *see also Everett v. Goldman*, 359 So.2d 1256 (La. 1978).

Under this regulatory scheme, the Governor and the Attorney General have the requisite connection to the enforcement of Act 825 to satisfy *Young*. The Governor appoints and supervises the board that reviews medical malpractice claims and the Attorney General supervises and oversees the appointment of counsel and the payments of settlements from the State's funds, as well as representing the

---

So.2d 859 (La. 1994) (citing LA. CIV. CODE art. 1880; LA. REV. STAT. ANN. § 49:257(B)); *Bruneau v. Edwards*, 517 So.2d 818, 824 (La. App. 1 Cir. 1987).

state's interests against constitutional challenges. The Governor and the Attorney General, through their appointment and oversight responsibilities, must determine which malpractice claims are exempt from the medical malpractice regulatory scheme under Act 825. *See Papasan*, 478 U.S. at 283 n.14; *cf. Eu*, 979 F.2d at 704 (determining that *Young*'s "connection" requirement was satisfied by the governor's duty to appoint and fill positions and the secretary of state's duty to certify elections, and stating that the statute in question "*is not the type that gives rise to enforcement*" (emphasis added)).

For example, has a physician who provides a woman with an intrauterine device ("IUD") performed an abortion?[74] Medical review panels will be required to review all medical malpractice actions arising out of the use of IUDs and determine whether the

---

[74] Medical authorities neither fully understand how IUDs work nor universally accept that IUDs are abortifacients, although there is strong evidence that an IUD prevents a conceptus (a fertilized female ovum, in the words of Act 825) from implanting in the uterine wall, thus terminating an intrauterine pregnancy. *Compare* John Whitridge, Williams Obstetrics 931 (18th ed. 1989) ("The mechanisms of action of the chemically inert device have not been defined precisely. Interference with successful implantation of the fertilized ovum in the endometrium seems to be the most prominent action.") *with How IUDs Prevent Pregnancy*, Population Reports, Population Information Program of the Johns Hopkins School of Hygiene and Public Health v. XXIII no. 5 (1995) (reporting that studies suggest IUDs prevent sperm from fertilizing ova and do not support the common belief that they usually work by preventing implantation.); *see also* Leon Speroff, Clinical Gynecologic Endocrinology and Infertility 782 (5th ed. 1994).

prescribing physician performed an "abortion" as defined by Act 825. The panels will likewise be called on to exercise discretion in applying the State's malpractice regime in cases arising out of treatment of chorioamnionitis. When a woman develops this intrauterine infection early in a pregnancy, she and the fetus may die if left untreated; however, the only available treatment will terminate the pregnancy. *See* WHITRIDGE at 751. Will the physician who treats the woman, saving her life but terminating the pregnancy, be held by the review panel to have performed an abortion and thus be disqualified for Title 40 protection? Such decisions employ, by statutory requirement, Appellants' regulatory powers. In yet another example, abortion procedures may be coupled with the administration of anaesthesia or tubal ligation, which remain eligible for the medical malpractice regime. Medical review panels will be called on to "enforce" Act 825 by determining which claims to exclude from the medical malpractice regime. *Cf. Eu*, 979 F.2d at 704.[75] Pharmacologically induced abortions, caused by such

---

[75] *Bethesda Lutheran Homes and Servs., Inc. v. Leean*, 122 F.3d 443 (7th Cir. 1997) (Posner, J.) (holding that out-of-state residents excluded by state law from a program to subsidize in-state hospitals could, under *Young*, sue state officials responsible for administering the program to enjoin them from exclusion); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1571 n.9 (10th Cir. 1995) (allowing, pursuant to *Young*, a suit by out-of-state residents against state officials to enjoin them from excluding the residents from a favorable method of obtaining hunting licenses).

agents as RU-486 or the "morning after pill" present still other enforcement questions because pharmacists, as well as physicians, are listed as "health care providers" for purposes of Title 40. *See* § 40:1299.41(A)(1). A physician, by prescribing RU-486, clearly performs an abortion under Act 825, since the drug accomplishes "the deliberate termination of an intrauterine human pregnancy after fertilization of a female ovum." Medical review panels will therefore have to regulate the circumstances under which Act 825 denies limits on malpractice liability for claims relating to prescriptions for and use of for such drugs. Consider also the emergency room surgeon presented with a pregnant woman who, having sustained blunt trauma in an automobile crash or a domestic violence incident, has a ruptured uterus. Since the mandated treatment for such condition includes the deliberate termination of the pregnancy, will the Governor's medical review panel deny the physician performing the procedure the protections of Title 40 and subject the doctor to unlimited liability for the death of the fetus? While far from exhaustive, these examples leave no doubt that the Governor and the Attorney General, through their supervision and control, have a routine, concrete role in enforcing Act 825.

We recently allowed health maintenance organizations ("HMOs") to bring a pre-emptive action against the Texas attorney general

and commissioner of insurance challenging a Texas act that, *inter alia*, creates a private cause of action for patients against their HMOs. *Corporate Health Ins., Inc.*, 215 F.3d 526, 532 & n.6 (5th Cir. 2000) (Higginbotham, J.). In *Corporate Health* we held that the plaintiffs had standing and the defendants were properly named because of the defendants' powers of appointment, supervision, and regulatory oversight over the Texas health insurance industry. We especially noted that the commissioner of insurance was a proper defendant given his "oversight authority" as was the attorney general because of his "regulatory reach" and general discretionary power to bring actions under the Texas Deceptive Trade Practices Act. *Id.* Such authority and power constituted sufficient connection to the enforcement of the challenged law, including the civil cause of action, to allow the suit to proceed pursuant to *Young*.

In light of *Corporate Health*, it is clear that "some connection" exists in this action by virtue of the Governor's and Attorney General's participation in the State's extensive medical malpractice regime. No principled distinction can be made between *Corporate Health* and this action to conclude that case or controversy exists in the former but not the latter. In this action, Appellants' connection to the enforcement of Act 825 is equivalent to, if not greater than, the connection between the

defendants and the challenged law in *Corporate Health*. The plurality's statement that we are powerless to hear Appellees' challenge in this case is contrary to Supreme Court law and conflicts with our reasoning and holding in *Corporate Health*.

V.

It is also apparent that Appellees have established a case or controversy against Appellants. Appellees' standing is clearly supported by the relevant decisions noted above. *E.g.*, *Casey*, 505 U.S. at 845; *Danforth*, 428 U.S. at 83-84; *Colautti*, 439 U.S. at 384 n.3; *Voinovich*, 130 F.3d at 192 n.3; *see also Corporate Health*, 215 F.3d at 532; *Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1102 (5th Cir. 1997). Notably, we have upheld Appellees' standing to challenge a civil liability provision contained in the State's partial-birth abortion statute against these same Appellants. *Causeway Med. Suite*, 221 F.3d at 811, *aff'g*, *Causeway Med. Suite*, 43 F. Supp. 2d at 609-10.

The majority opinion, while conceding that Appellees have uundoubtedly established an "injury-in-fact," simply concludes that Appellants had not caused any injury to Appellees. Such conclusion ignores and is in conflict with the authority upholding standing for abortion providers and clinics asserting their own rights for *potential* injury to economic opportunity or liberty as well as the liberty interests of their patients. *E.g.*, *Singleton v. Wulff*, 428

U.S. 106, 118 (1976); *Causeway Med. Suite*, 221 F.3d at 811; *Causeway Med. Suite*, 109 F.3d at 1102; *Greco v. Orange Mem. Hosp. Corp.*, 513 F.2d 873, 875 (5th Cir. 1975) (noting abortion provider's individual economic and liberty interest in practicing medicine free from arbitrary restraints). More importantly, the majority fails to effectively analyze why the plaintiffs in *Casey*, *Causeway Medical Suite*, *Voinovich*, *Miller*, and *Corporate Health* were able to successfully allege that a civil liability provision created an injury-in-fact traceable to the defendants when the named defendants had no ability to "enforce" the provision.

The majority summarily dismisses the existence of causation and redressability notwithstanding our past declaration that "the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases." *Margaret S.*, 794 F.2d at 997 (Higginbotham, J.) (citing *Roe*, 410 U.S. at 123-29, and *Doe*, 410 U.S. at 187-89). As discussed above, the threatened injury is exposure to unlimited damages for strict liability for performing abortions, which Appellants directly regulate. Moreover, we have held that "a plaintiff must establish that the injury is fairly traceable to the proposed government action or *inaction*." *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998) (Benavides, J.) (emphasis added); *Luckey*, 860 F.2d at 1016. Appellees' injury, risk of unlimited strict liability, is fairly traceable to

-118-

Appellants' role in Louisiana's medical malpractice regime because Appellants will enforce Act 825 by excluding Appellees from Title 40 coverage for claims pursuant to Act 825–i.e., Appellants will enforce Act 825 by not acting under Title 40. This enforcement by "inaction" means that the PCFOB will not defend against the quantum of damages, the Governor (through his commissioner of administration) will not oversee the determination of liability, the Governor will not pay for the proceedings if a ruling is in favor of the abortion doctor, and the Attorney General will not have to appoint counsel or authorize any settlement in excess of $25,000.

Despite this rather simple chain of causation, the majority begs the question by concluding that because Act 825 is a private tort statute, Appellants have no coercive power sufficient to make the necessary causal connection.[76] However, Appellants wield

---

[76] To this end, the majority's citation of *Muskrat v. United States*, 219 U.S. 346 (1911), and *Gritts v. Fisher*, 223 U.S. 640 (1912), is inapposite. *Muskrat* concerned Congress's statutory creation of jurisdiction in federal court allowing individuals to sue the United States for judicial review of the constitutionality of certain statutes. The Supreme Court held that such statutory creation of jurisdiction did not create a case or controversy because the United States had no interest or stake in the litigation adverse to the plaintiffs. In this action, Act 825 does not confer jurisdiction in federal court to sue a particular defendant, and it is clear that Appellees have a distinct case or controversy against Appellants because Appellants' interests are directly adverse to Appellees' interests.

Moreover, contrary to the majority's explanatory parenthetical that states that the defendant in *Gritts* was sufficiently adverse

-119-

coercive power because their duty to execute and uphold the constitutionality of Act 825 constitutes the power to effectuate the Act's coercive impact. *See Mobil Oil Corp. v. Attorney General*, 940 F.2d 73, 76-77 (4th Cir. 1991) (noting that a case or controversy exists in a constitutional challenge to a private enforcement statute because the state official has sufficient adverse interests by having the power to intervene to defend the statute);[77] *cf. Papasan*, 478 U.S. at 283 n.14. Moreover, Appellees

---

to the plaintiffs to create an Article III controversy, *Gritts* does not even mention Article III case or controversy requirements or standing. These decisions simply do not support the majority's reasoning.

[77] The majority's interpretation of *Mobil Oil* belies the Fourth Circuit's express holding. Contrary to the majority's conclusion that "controversy was founded upon the Attorney General's explicit statutory authority," the Fourth Circuit held that such statutory authority is "irrelevant" because "[w]hether Mobil has a dispute with its franchisees does not bear on whether it has a dispute with the Attorney General." *Mobil Oil*, 940 F.2d at 76 (footnote omitted); *see also id.* n.2 ("'A controversy exists not because the state official is himself a source of injury but because the official represents the state whose statute is being challenged as the source of the injury.'" (quoting *Wilson v. Stocker*, 819 F.2d 947 (10th Cir. 1987)). The court added that even in private enforcement suits, the Attorney General "could intervene" to defend the constitutionality of the statute under 28 U.S.C. § 2403(b), and cited for support a private medical malpractice suit in which the Attorney General had so intervened. *Id.* at 76-77 (citing *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1989)). Thus, *Mobil Oil* is properly read as equating an official's independent power of enforcing a statute with the power to intervene in an action to defend that statute to create "an odor of a 'case or controversy." *Id. at 77; see also id.* at 75 ("[T]he Declaratory Judgment Act was designed[] . . . [to] encourage a person aggrieved by laws he considers unconstitutional to seek a

have asserted that Appellants' failure to limit potential liability for claims based on abortion-related injuries by "acting" under Act 825 will cause the injury-in-fact. *See* Compl. for Decl. Relief ¶ V at 3, *reprinted in* R. at 196. The majority's flawed reasoning creates a double standard by which Appellants, who perform an unpopular but constitutionally protected procedure, are effectively barred from bringing any pre-enforcement challenge in federal court, whereas similarly situated HMOs are free to demand a federal forum.[78]

Lastly, the majority erroneously concludes that Appellees fail to satisfy the "redressability" requirement of standing because the

---

declaratory judgment *against the arm of the state entrusted with the state's enforcement power*." (emphasis added))

[78] The majority's suggestion that Louisiana courts are available to hear Appellees' claims is untenable. To the extent the majority suggests that the Eleventh Amendment reflects a forum-selection theory, the Supreme Court in *Alden v. Maine*, 119 S. Ct. 2240, 2263 (1999), rejected such theory by holding that the Eleventh Amendment embodies a broad state sovereign immunity that applies in both federal and state courts. *Id.* ("*Young* is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land.").

Moreover, according to a majority of current Supreme Court Justices it is improper to consider the availability of state courts in determining whether relief pursuant to *Young* is permissible. *Idaho v. Coeur D'Alene Tribe of Idaho*, 117 S. Ct. 2028, 2045 (1997) (O'Connor, J., joined by Scalia, Thomas, JJ., concurring); *id.* at 2048 (Souter, J., joined by Stevens, Ginsburg, Breyer, JJ., dissenting).

injunction granted by the district court is "utterly meaningless."
Ironically, this is the same argument Appellants offered and we
rejected in *Causeway Medical Suite*, 109 F.3d at 1102. There, these
Appellants asserted that Appellees lacked standing to challenge
judicial bypass procedures because they did not have "the power to
enforce private-action court procedures." *Id.* Appellants argued
that the injunction in this case is 'hypothetical and
meaningless.'" *Id.* We rejected this argument under *Casey*. *Id.*
More importantly, the majority reaches its conclusion without any
authority, ignoring our "duty to decide the appropriateness and the
merits of the declaratory request *irrespective of [our] conclusion
as to the propriety of the issuance of the injunction*" in actions
brought under the Declaratory Judgment Act, 28 U.S.C. § 2201
(1994). *Steffel v. Thompson*, 415 U.S. 452, 468 (1974) (emphasis
added); *cf. id.* at 478 (Rehnquist, J.) ("[The primary purpose of
the Declaratory Judgment Act is] to enable persons to obtain a
definition of their rights before an actual injury occurred.").
The Supreme Court has held that "it is not necessary to decide
whether [a plaintiff's] cause of action against the [defendant]
based directly on the Constitution is in fact a cause of action on
which [the plaintiff] could actually recover. . . . Instead the
test is whether the cause of action alleged is so patently without
merit as to justify the court's dismissal for want of

jurisdiction." *Duke Power v. Carolina Env'l Study Group*, 438 U.S. 59 (1978) (internal quotation marks omitted); *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury."). The majority's fixation with the "meaning" of the injunction is not based on a rule of law, but rather on an arbitrary principle ignoring Louisiana law and designed to restrict access to federal courts.

A suit for declaratory and injunctive relief is the classic procedural mechanism for challenges to the constitutionality of state abortion statutes. *E.g.*, *Casey*, 505 U.S. at 845; *Roe*, 410 U.S. at 120; *Doe*, 410 U.S. at 185. Without regard to the meaning of an injunction, we have upheld the issuance of such injunction to enjoin these Appellants from enforcing a civil liability statute for damages for violation of Louisiana's ban on partial-birth abortions. *Causeway Med. Suite*, 221 F.3d at 811, *aff'g*, *Causeway Med. Suite*, 43 F. Supp. 2d at 619. Moreover, Appellees' injury can be specifically redressed by an injunction against the Governor to order his agents and subordinates to disregard Act 825 in reviewing civil claims against women's health care providers and making their legal and factual recommendations as to liability and damages. *See*

§ 39:4.C ("The division of administration shall exercise such other duties and functions germane to its primary functions as may be prescribed by law or as directed by the governor by executive order."). It can further be redressed by an injunction against the Attorney General requiring him to appoint counsel to defend civil suits on an equal basis with non-abortion providers in medical malpractice cases. *See* § 39:1533.B.

## VI.

Based on the foregoing, I conclude that the Eleventh Amendment does not bar consideration of this case in federal court and that Appellees have asserted a "Case or Controversy" against Appellants.